In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 06-3980

XIU LING CHEN,

*Petitioner*,

v.

ALBERTO R. GONZALES, Attorney General
of the United States,

*Respondent.*

---

Petition for Review of an Order of
the Board of Immigration Appeals.

---

ARGUED MAY 3, 2007—DECIDED JUNE 11, 2007

---

Before EASTERBROOK, *Chief Judge*, and FLAUM and
RIPPLE, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Xiu Ling Chen has borne
two children since entering the United States illegally
in 2001. When caught, she requested asylum on the
ground that China had compelled her to have an abortion
in 1993. Involuntary abortion qualifies an immigrant as
a "refugee" under 8 U.S.C. §1101(a)(42)(B). At the hear-
ing before an immigration judge, however, Chen conceded
that her application and accompanying affidavit had
been false—that she had never undergone an abortion but
had committed perjury because she had been told that
the claim would help her remain in this country. Chen

now acknowledges that China did not mistreat her in any way. Nonetheless, Chen asserts, she is entitled to asylum because, having had two children, she will be sterilized should she return to China. She says that she wants to have additional children but that China will prevent this forcibly.

The immigration judge rejected that contention, following the State Department's conclusion that China has switched from physical coercion to economic incentives as means of reducing the birth rate. That is indeed the declared policy of China's central government, though Chen insists that many provincial officials do not follow the national government's rules. The Board of Immigration Appeals affirmed, largely relying on *Matter of C- C-*, 23 I&N Dec. 899 (BIA 2006). In that decision the Board canvassed the evidence about population policy in China—and in particular in Fujian, the province from which Chen hails—and concluded that women who have had children in the United States do not face a substantial risk of either compulsory abortions or sterilization on returning to China.

Chen maintains that the IJ and Board failed to evaluate the credibility of persons who provided affidavits stating that they had heard of involuntary abortions or sterilizations in Fujian. The Board is entitled, however, to respond to the normal conditions in a nation or region, and it need not change course every time an alien offers a slightly different mix of evidence. Hearsay—and for that matter accounts of personal experience, which may or may not be truthful (Chen's initial account of her own experience concededly was not honest)—has limited bearing when the question is how a foreign nation as a whole treats its citizens. Domestic experience illustrates the point. American newspapers and television broadcasts are full of stories about automobile crashes and murders, but the mortality risk to any given person is tiny. Affida-

vits describing some auto accidents or shootings in Illinois would not demonstrate that the risk from these events in Illinois is substantial. Likewise affidavits relating personal experiences or tales about sterilizations in Fujian would not establish that a person in Chen's position faces a material risk that this would happen to her.

To determine whether an alien faces persecution in a foreign land, the agency must separate normal from exceptional events. In *Matter of C- C-* the Board tried to do this with respect to Fujian's family-planning policy. That's a sensible way to proceed. Indeed, we have strongly urged the agency to do this, e.g., *Banks v. Gonzales*, 453 F.3d 449 (7th Cir. 2006); *Sahi v. Gonzales*, 416 F.3d 587 (7th Cir. 2005), and are gratified to see that the process of making risk assessments for particular groups and regions as a whole is under way. Cf. *Heckler v. Campbell*, 461 U.S. 458 (1983) (holding that a similar approach for the Social Security disability program is within the agency's discretion, and that having adopted rules based on the normal effects of a condition the agency need not receive evidence that a particular situation is exceptional).

Unfortunately, however, the decisions in *Matter of C- C-* and Chen's case got only part way. China may have switched from physical to financial instruments, but how substantial are the penalties for having what China sees as too many children? We know from decisions such as *Maher v. Roe*, 432 U.S. 464 (1977), and *Rust v. Sullivan*, 500 U.S. 173 (1991), that incentives differ from compulsion. *Maher* held that states may favor childbirth over abortion by subsidizing the former but not the latter, and that doing this does not offend the rule that states may not place substantial burdens on women who seek abortions. But these are modest incentives; China's may be more substantial. The State Department's latest country report says that "social compensa-

tion payments" as high as 10 years' wages (of an average worker) may be assessed against families that have a third child. Is the threat of such a high payment equivalent to "force"? The Board did not address that subject in *Matter of C- C-* or Chen's appeal.

*Matter of T- Z-*, 24 I&N Dec. 163 (BIA May 9, 2007), picks up where *Matter of C- C-* leaves off. The Board concluded in *Matter of T- Z-* that financial incentives to have an abortion or undergo sterilization amount to "force" when "a reasonable person would objectively view the threats for refusing the abortion to be genuine, and the threatened harm, if carried out, would rise to the level of persecution." 24 I&N Dec. at 168. Well, what's "the level of persecution"? Adopting language in a committee report, the Board wrote that financial incentives become persecution when they amount to "the deliberate imposition of severe economic disadvantage or the deprivation of liberty, food, housing, employment or other essentials of life.*" Id*. at 171. The Board wrapped up:

> Government sanctions that reduce an applicant to an impoverished existence may amount to persecution even if the victim retains the ability to afford the bare essentials of life. A particularly onerous fine, a large-scale confiscation of property, or a sweeping limitation of opportunities to continue work in an established profession or business may amount to persecution even though the applicant could otherwise survive.

*Id*. at 174. A fine of 10 years' income, imposed on someone who makes the normal wage in China, reasonably may be described as "particularly onerous." The only practical alternative would be to avoid having more children, if necessary by abortion or sterilization.

That does not resolve matters in Chen's favor, however, because it remains essential to know China's actual *policy*.

If the maximum lawful "social compensation payment" is collected only from people who can afford it (say, families that earn well above the average income or have substantial wealth), then it need not be onerous. Again consider the domestic situation. Some statutes authorize fines of $1 million or more, well above 20 years' income for an average wage-earner, but these are rarely if ever levied on people who enjoy average or below-average earnings. They are imposed only on those who can afford to pay. The Board needs to decide (a) what financial exactions normally are *used* in Fujian, and (b) how these consequences should be classified under the legal standard that separates inducement and encouragement (allowed) from "force" (which our law treats as persecution).

On remand the Board also must consider evidence now before it as a result of *Shou Yung Guo v. Gonzales*, 463 F.3d 109 (2d Cir. 2006), and *Jin Xiu Chen v. Gonzales*, 468 F.3d 109 (2d Cir. 2006). The second circuit has instructed the Board to address the significance of a pamphlet issued by family-planning officials in Changle, a substantial city (population about 700,000) in Fujian. A translation of Changle's family-planning handbook offered to the second circuit stated that birth of a second child would result in mandatory sterilization. If the handbook is genuine and current, the translation accurate, and the threat serious (as opposed to saber-rattling), this would call into question the conclusion of *Matter of C- C-* that Fujian no longer uses force in its family-planning program. It would be especially important to Chen, who lived in Changle before making her way to the United States.

*Matter of C- C-* adopted through litigation a rule functionally equivalent to the Grid developed by the Social Security Administration via rulemaking. Both approaches are ways to create binding principles of administrative

law. See *NLRB v. Bell Aerospace Co.*, 416 U.S. 267 (1974); *American Hospital Ass'n v. NLRB*, 499 U.S. 606 (1991). One consequence of making one rule to cover every case, however, is that a decision anywhere in the country vacating and remanding for reconsideration likewise may have national effect. The Solicitor General did not seek certiorari in either *Shou Yung Guo* or *Jin Xiu Chen*. Although the United States, not being affected by offensive nonmutual issue preclusion, may insist that a rule remain in force outside the circuit that made a decision, see *United States v. Mendoza*, 464 U.S. 154 (1984), the Attorney General did not invoke this entitlement either at oral argument or by follow-up letter after the court queried counsel about the effect of the second circuit's decision. We must take it, then, that the agency concedes that reconsideration of the subject is essential. This is not to say that reconsideration must come in *Shou Yung Guo* or *Jin Xiu Chen*—or for that matter in this case. It is only to say that the rug has been pulled out from under the Board's decision here, and until a new floor covering is in place Chen is entitled to remain in this nation.

The decision of the Board is vacated, and the matter is remanded for further proceedings consistent with this opinion.

R<small>IPPLE</small>, *Circuit Judge*, concurring. I concur in the judgment of the court. I also join the court's opinion except with respect to its advice to the agency that it restructure its decision-making process to create rigid categories for refugees that share certain ethnic or regional

characteristics. Equal treatment of similarly situated persons is, of course, a goal of any civilized justice system and, as the remainder of the court's fine opinion quite cogently demonstrates, that goal definitely has not been achieved in this case. When it comes to restructuring the agency process by which that goal is sought, however, the decision should be made, in the first instance, by the agency itself within whatever confines Congress desires to establish for the exercise of agency discretion. While individual members of the judiciary may have views on how the agency can best perform, I believe that, *as an institution*, we ought to refrain from such pronouncements. Refugee policy is a most difficult and sensitive issue, and individuals of great intelligence and vision have wrestled with it for a very long time. Whether turning the immigration process into a duplicate of the present social security system is a silver bullet for resolving problems that, up to now, have evaded resolution is a question that we should leave to governmental entities that are far more institutionally qualified. We are a case-deciding institution and need to confine our *institutional pronouncements* to that function.

A true Copy:

        Teste:


                        _____
                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*