In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 05-1780

YAN SONG WANG, ZHU LIN and TAO WANG,

*Petitioners,*

*v.*

PETER D. KEISLER, Acting Attorney General of the
United States,

*Respondent.*

---

Petition for Review of an Order of the
Board of Immigration Appeals.
Nos. A70-897-525, A78-674-813 & A78-674-814

---

ARGUED JANUARY 9, 2007—DECIDED SEPTEMBER 20, 2007

---

Before BAUER, RIPPLE, and EVANS, *Circuit Judges*.

BAUER, *Circuit Judge*. Yan Song Wang ("Wang") and Zhu Lin ("Lin") are natives and citizens of China and husband and wife. They were born in China's Fujian province and lived there until leaving for the United States. Along with their eldest son, Tao Wang ("Tao), who is also a Chinese native, they seek review of the final decision of the Board of Immigration Appeals that denied their petitions for asylum, withholding of removal, and relief under the Convention Against Torture. Because the BIA's decision was supported by substantial evidence, we deny their petition for review.

**I. Background**

Wang entered the United States without a valid entry document on February 3, 1990 and applied for asylum, withholding of removal, and relief under the CAT on April 14, 1993. Lin and Tao entered the United States without valid entry documents on December 25, 1999. Lin filed an application for asylum on December 14, 2000, claiming that she was forced against her will to undergo an abortion while in China and that she wanted to stay in the United States in order to raise her family.

After the former Immigration and Naturalization Service initiated removal proceedings against petitioners, the Immigration Judge ("IJ") held a consolidated hearing on the merits of their asylum applications. The record at the hearing consisted almost entirely of Wang's and Lin's testimony and documentation. They testified to getting married first in a customary ceremony on January 8, 1987, followed by a legal ceremony on June 9, 1989. They testified that a few months before their legal marriage ceremony, Lin gave birth to Tao. At that time, Lin had not yet reached the legal age for marriage. As a consequence, she did not have the requisite legal permit and could not go to a hospital to give birth. They testified further that when the local population control authorities learned of Tao's birth, they were fined 2,500 RMB. They also testified that when Lin became pregnant again in September 1989, local population control authorities forced her to undergo an abortion. At the time of the hearing, in May 2001, Lin was pregnant again. She testified that if she was returned to China after the birth of her second child, she would be forced to undergo an involuntary sterilization.

In an oral decision, the IJ denied petitioners' asylum applications and ordered them removed to China. The IJ explained that he found that their testimony was not

credible and concluded that they had failed to establish past persecution or a well-founded fear of future persecution. The IJ offered numerous reasons for his adverse credibility determinations. First, he explained that when Wang initially filed his asylum application in 1993, he claimed that Lin had undergone "sterilization," as opposed to abortion. While Wang corrected this error later in his interview with the asylum office and during his testimony during the hearing, the IJ found that Wang had not explained his reasons for this error adequately.

The IJ then explained his disbelief of petitioners' testimony concerning the involuntary abortion. Lin had testified that about a month after Tao was born, they returned to live with Wang's family in Yingu. After the population control authorities learned of Tao's birth, they notified Lin that she had to undergo a "female examination of birth matters" in April. According to Lin, she was required to present herself for these examinations four times a year. After giving birth to Tao, Lin did not go to any of these examinations. She testified that when she had failed to go to an examination, the local population control authorities caught her and forced her to go to the family planning office in June of 1989. Lin testified that, against her will, the family planning officials inserted an IUD (an intrauterine device) into her, which she later had removed by a private physician. She testified that she subsequently became pregnant. The IJ found this testimony incredible, however, because she had not hidden this pregnancy or sought to avoid the authorities. Lin had testified that she had moved to her own parents' home when she was pregnant with Tao, but she did not testify that she had returned there when she became pregnant the second time. The IJ further reasoned that by removing the IUD and becoming pregnant, Lin was aware of the fact that her pregnancy may not be considered authorized, and yet she remained at home with her

husband without any apparent thought of enforcement by the authorities.

The IJ also did not credit Lin's testimony that she had told the authorities that she was pregnant when they came to her in-laws' home in December of 1989. Because Lin was trying to hide her pregnancy, the IJ reasoned, she could have denied that she was pregnant and told the authorities that she would submit to a physical exam. And even if she had told the authorities of her pregnancy, they did not force her to have an abortion immediately. According to Lin's testimony, she was to report for an abortion three days later. The IJ noted, however, that Wang and Lin did nothing: they remained at home until December 26.

Even assuming that Lin was pregnant, that she told the authorities that she was pregnant, and that she was told to go for an abortion, the IJ found incredible Lin's and Wang's testimony about their subsequent actions. Lin had testified that she and Wang planned to flee the country on December 26, the day that she was to report for the abortion, at noon. She said that she had not expected the authorities to arrive on December 26. Lin testified that at 9:00 in the morning on December 26, personnel from the family planning office arrived at her home to collect her for the abortion. Wang was not at home at that time. According to their testimony, he was working in the fields. Lin also stated that she could hear Wang outside of the surgery room, fighting with the local family planning personnel.

In rejecting this testimony, the IJ explained that the timing of the events did not make sense. Lin had admitted that she was taken to a district hospital, which was more than an hour away. Wang had testified that when he learned that Lin had been taken for an abortion, he went to the hospital, arriving before the abortion had taken

place, and fought with the family planning officials. Moreover, despite Wang's altercation with the local family planning personnel, he was not arrested. Instead, he was allowed to remain in the hospital, to see Lin, and to return home. Wang testified that he decided to flee China after the altercation, telling Lin of this decision the next day, December 27, and that he was able to arrange to leave China in a period of a few days. Wang testified that he left China on January 1, 1990 because he feared getting arrested, tortured, beaten, and jailed. The IJ did not believe that Wang made the decision to leave, informed Lin of this decision, made the arrangements to leave, and fled China in such short order.

Additionally, Wang did not disclose the alleged fight in the hospital on his original asylum application or to his asylum officer when speaking about this case. The IJ explained that this omission was a significant adverse factor on his credibility. Wang also had applied for three separate applications to return to China. In these applications, he explained that the reason for his return was related to his mother's illness; at the hearing, he testified that he desired to return to China because of his father's illness.

Finding petitioners' testimony not credible, the IJ considered the evidence offered by petitioners to corroborate their story but again found it unbelievable. They offered an unauthenticated "certificate" that purported to be from the hospital in which Lin had the abortion. Wang had not offered this certificate when he originally filed for asylum and did not bring it with him to his interview with the INS in 1997. The IJ also found the certificate suspect based on Lin's testimony. The certificate appeared to have been issued on December 26, 1989, the day that Lin claimed she had the abortion, and was supposedly given to her when she was released from the hospital on December 30, 1989.

The IJ also considered the U.S. Department of State's 2000 Country Reports on Human Rights Practices for China. According to this report, the Chinese Central Government's family planning policy formally prohibits the use of force to compel persons to submit to abortion. Another report complied by the Research Directorate of the Immigration and Refugee Board in Canada, dated March 14, 2000, examined the specific conditions in the Fuzhou county area, which was near where petitioners lived. This report stated that there is less effective enforcement of the "one child" policy in that area and that "forced abortion and forced sterilization are reportedly not tolerated. . . ." The IJ found that these reports did not support Lin's testimony that she was taken into custody and forced to have an abortion.

Petitioners filed a timely appeal with the BIA, which found that the IJ had failed to address petitioners' claims of a well-founded fear of future persecution if they returned to China. The BIA remanded the matter to the IJ, who conducted three additional hearings on petitioners' claim of a well-founded fear of future persecution. The IJ then issued a second decision, noting that petitioners had testified in support of their claimed fear of returning to China and their belief that family planning personnel would force either Wang or Lin to undergo sterilization. Having considered their testimony, the IJ determined that petitioners had failed to establish a reasonable probability of sterilization if they were forced to return to China. He explained that he had not believed their earlier testimony and that they had not offered anything to show that their testimony should be found more credible concerning the issue of future sterilization. The IJ relied again on a State Department report, this one dated April 14, 1998, which concluded that couples who have violated the "one child policy rule" do not face sterilization on their return to China. They instead face fines if they are

from urban areas, such as Shanghai. This conclusion also was reached in the report from the Research Directorate, Immigration and Refugee Board, Ottawa, Canada. Recognizing that petitioners are not from urban areas, the IJ noted the State Department Profile indicated that the one child policy was not implemented or is more lenient in rural areas than in urban areas, a fact conceded by petitioners' attorney. The IJ rejected evidence offered by petitioners from their relatives in China, which purported to be a certificate from the Yang Yu Village People's Committee. According to the certificate, because petitioners are residing in the United States and have two children, they must be sterilized. The IJ gave little weight to this certificate because petitioners had failed to explain how it was obtained and it was an unauthenticated, self-serving report that they had obtained for the purpose of their asylum applications in 2003. The IJ then denied petitioners' applications for asylum, withholding of removal, and relief under the Convention Against Torture.

Petitioners filed a timely appeal with the BIA, which adopted and affirmed the IJ's decision. The BIA explained that the shortcomings and inconsistences cited by the IJ were present in the record, that such shortcomings and inconsistencies provided specific and cogent reasons to conclude that their claim was not credible, and that petitioners had offered no adequate explanation for these discrepancies and shortcomings on appeal or before the IJ. As to specific findings of the IJ, the BIA found that the IJ had noted correctly that although Wang claimed that he feared that he would be harmed by Chinese officials because of the altercation in the hospital in December of 1989, he had sought to return to China from the United States on three occasions. Like the IJ, the BIA reasoned that if Wang truly possessed a well-founded fear, it is not likely that he would have sought to return to

China. The BIA further explained that the IJ had found correctly that Wang had failed to disclose the fight in his initial asylum application and that he had claimed incorrectly that his wife had been sterilized without mentioning an abortion. Finally and most significantly, the BIA concluded, Wang and Lin decided to remain at home after they were told by the family planning officials that Lin would undergo an abortion on December 26, 1989. The BIA considered this situation to be a "very significant contradiction" in their case. Accordingly, the BIA dismissed petitioners' appeal. Now present before this Court is petitioners' timely petition for review of the BIA's decision.

## II. Analysis

Because the BIA adopted and affirmed the IJ's decision to deny petitioners' applications for asylum, we review the IJ's decision as supplemented by any discussion in the BIA opinion. *Mema v. Gonzales*, 474 F.3d 412, 416 (7th Cir. 2007). Petitioners challenge the decisions of the IJ and BIA, arguing that they had proved that they were entitled to asylum based on past persecution and that they had demonstrated a well-founded fear of future persecution based on China's coercive birth control policies.

Our review of a decision denying asylum is deferential. *See Gjerazi v. Gonzales*, 435 F.3d 800, 807 (7th Cir. 2006). "[W]e require only that the decision be supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* (internal citations and quotation omitted). We will reverse an agency's decision only if the record compels a contrary result. *Youkhana v. Gonzales*, 460 F.3d 927, 931 (7th Cir. 2006) (citation omitted). We may not reverse simply because we would have decided the case differently. *Margos v. Gonzales*, 443 F.3d 593, 597 (7th Cir. 2006) (citations omitted).

In denying petitioners' applications for asylum, the IJ explained that they had failed to establish their burden of proof and persuasion because he found the testimony of Wang and Lin implausible and incredible. He stated that they had failed to present authenticated or genuine evidence that an abortion had occurred in China or, if such an abortion did occur, that it was involuntary. The adverse credibility determinations of an IJ "must be made with reference to specific, cogent reasons that bear a legitimate nexus to the finding." *Adepke v. Gonzales*, 480 F.3d 525, 530 (7th Cir. 2007). And we give substantial deference to these determinations. *Korniejew v. Ashcroft*, 371 F.3d 377, 382 (7th Cir. 2004). "We will not overturn adverse credibility determinations simply because the evidence might support an alternate finding." *Kllokoqi v. Gonzales*, 439 F.3d 336, 341 (7th Cir. 2005). "Credibility determinations are questions of fact and should be overturned under extraordinary circumstances." *Shmyhelskyy v. Gonzales*, 477 F.3d 474, 479 (7th Cir. 2007). Such extraordinary circumstances are absent from the present petition.

In this case, the IJ's adverse credibility determinations are adequately supported by the record. The IJ and BIA relied on the inconsistencies in Wang's testimony, including his statements about his reason for seeking asylum on his initial asylum application and at the immigration hearing. Wang initially based his asylum application on the claim that Lin had been sterilized, making no mention of the forced abortion. This Court has acknowledged that "initial asylum applications should not always be considered completely reliable, particularly when filled out without the assistance of counsel." *Chen v. Gonzales*, 420 F.3d 707, 710 (7th Cir. 2005) (*citing Pop v. INS*, 270 F.3d 527, 532 (7th Cir. 2001)). At the same time, this Court has recognized that "[s]ignificant discrepancies among different versions of an alien's statement are generally a

permissible basis for an adverse credibility decision." *Chen*, 420 F.3d at 710 (*citing Capric v. Ashcroft*, 355 F.3d 1075, 1089-90 (7th Cir. 2004)). Wang testified that he had used a service center in New York to prepare his first asylum application and denied telling the center's personnel that his wife was forcibly sterilized. Such testimony, which goes to the heart of petitioners' claim for asylum, does not explain his failure to include information about the abortion in his initial application.

Also significant to the adverse credibility determination was Wang's failure to mention the fight that occurred at the hospital when Lin was about to have the abortion. According to his testimony at the hearing, Wang feared that he would be arrested following the fight, which spurred his decision to leave China. It is reasonable to expect that an asylum applicant would describe such an invasive event when asked to describe mistreatment. *See Capric,* 355 F.3d at 1090. A fight with family planning officials outside the room in which his wife was undergoing a forced abortion would be highly relevant to Wang's claim that he had suffered past persecution or has a well-founded fear of future persecution in China. We cannot say that the IJ incorrectly relied on this omission in its adverse credibility determination. *See, e.g.*, *Korniejew*, 371 F.3d at 384 (upholding adverse credibility determination where petitioner had failed to mention in earlier proceedings that her husband had been arrested and killed for political reasons).

Most significant to the BIA's decision adopting and affirming the IJ's decision was petitioners' failure to leave or to go into hiding after being informed by the local family planning officials of the specific day that Lin was to undergo an abortion. We agree that such inaction undermines petitioners' claims of past persecution. Petitioners asserted that they were preparing to flee: Lin had testified that they planned to leave December 26 at noon. Petition-

ers also had testified, however, that they were fined for having Tao, Lin was forced to have an IUD implanted, and Lin was told that she was to undergo an abortion on December 26. After such actions and with such an explicit warning, it simply does not make sense that petitioners would wait to flee the area until the day of the scheduled abortion.

Additionally, the IJ's disbelief as to Wang's testimony about his decision to flee China and the length of time that it took him to arrange to leave was based on more than simply his own assumption as to how long it should take Chinese residents to arrange passage to the United States. Rather, it was the short lapse of time between Wang's decision to flee, his informing Lin of this decision, and then his actual departure that the IJ found questionable. *Cf. Chen*, 420 F.3d at 709 (rejecting as conjectural and speculative the IJ's adverse credibility finding based on petitioner's testimony that it took him nine days to make arrangements and to pay $1,000 to be smuggled from China to the United States). In any event, even if this additional rationale for the IJ's adverse credibility finding was based on nothing more than the IJ's personal speculation or conjecture, the other bases identified by the IJ were sufficient to support the adverse credibility determination.

The documentary evidence offered by petitioners did not resolve the inconsistencies in their testimony or overcome the adverse credibility determination. The unauthenticated certificate that purported to be from the hospital in which Lin had the forced abortion does not explain the contradictions in Wang's testimony. To the extent that it corroborates petitioners' testimony, it only shows that an abortion occurred. It does not show that the abortion was involuntary. *See, e.g.*, *Huang v. Gonzales*, 453 F.3d 942, 947 (7th Cir. 2006) (recognizing that such a certificate suggests that the asylum applicant under-

went a "voluntary" abortion). Under our deferential review of an IJ's credibility determinations, we find that the substantial evidence in this case does not compel reversal.

Adverse credibility determinations aside, we likewise find that substantial evidence supports the IJ's conclusion that petitioners do not have an objectively reasonable fear of future persecution. Because they failed to offer credible evidence of past persecution, petitioners needed to demonstrate that they genuinely fear persecution if they return to China and that fear is objectively reasonable. *See Boci v. Gonzales*, 473 F.3d 762, 767 (7th Cir. 2007). In support of their asserted well-founded fear of future persecution—forcible sterilization—petitioners offered an unauthenticated certificate from their village that indicated that because petitioners reside in the United States and because they have two children, they must be sterilized. The IJ gave little weight to this certificate because it was unauthenticated, *see* 8 C.F.R. § 287.6, and obtained for purposes of the hearing, concluding that petitioners' fear was not objectively reasonable. Petitioners' certificate also did not establish that they could not relocate to another area of China in order to avoid punishment by their village's family planning officials. *See* 8 C.F.R. § 1208.13(b)(2)(ii) ("An applicant does not have a well-founded fear of future persecution if the applicant could avoid persecution by relocating to another part of applicant's country of nationality . . . if under all the circumstances it would be reasonable."); *Matter of R-*, 20 I & N Dec. 621, 625-27, 1992 WL 386814 (BIA 1992). The IJ instead relied on the April 14, 1998 State Department report, which concluded that couples who have violated the one child policy face fines, rather than sterilization, on their return to China. He also relied on the report from the Research Directorate, Immigration and Refugee Board, Ottawa, Canada, which stated that the one child policy is not implemented or is enforced more leniently in rural areas.

The IJ's conclusion is supported by two recent BIA decisions: *Matter of J- H- S-*, 24 I&N Dec. 196 (BIA 2007) and *Matter of J- W- S-*, 24 I&N Dec. 185 (BIA 2007).[1] In *Matter of J- W- S-*, the BIA acknowledged that a July 1999 *Q&A for Changle City Family-Planning Information Handbook*, which the Second Circuit referenced in *Shou Yung Guo v. Gonzales*, states that sterilization is mandatory following the birth of a second child. 24 I&N at 192 n.7. The BIA also examined the Changle City Family Planning Policy Leading Team, which states that "subjects" who give "out-of-plan birth . . . must be imposed with sterilization operation." 24 I&N Dec. at 192. In that particular case, however, the BIA determined that the asylum applicant had failed to demonstrate a well-founded fear of future persecution because even assuming that this policy is in effect, the applicant had not provided evidence that the policy is implemented through physical

---

[1] In a recent decision, this Court directed the BIA to consider evidence that was before it as a result of the Second Circuit decisions in *Shou Yung Guo v. Gonzales*, 463 F.3d 109 (2d Cir. 2006) and *Jin Xiu Chen v. United States DOJ*, 468 F.3d 109 (2d Cir. 2006). *Xiu Ling Chen v. Gonzales*, 489 F.3d 861, 863 (7th Cir. 2007). Specifically, the BIA was to address the significance of a pamphlet issued by family-planning officials in Changle, a city in Fujian. *Id.* The translation of this pamphlet stated that the birth of a second child would result in mandatory sterilization. *Id.* This Court reasoned that if the handbook proves genuine and current, the translation accurate, and the threat serious, it would call into question the conclusion reached in *Matter of C-C-,* 23 I&N Dec. 899 (BIA 2006), that Fujian no longer uses force in its family planning program. Unbeknownst to this Court, the BIA had considered the significance of this pamphlet, along with other, more current documentary evidence, including U.S. State Department country reports and profiles, in these two decisions issued three days prior to decision in *Xiu Ling Chen*.

force or other means that would amount to persecution. *Id.* Additionally, the BIA considered a recent State Department profile, Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *China: Profile of Asylum Claims and Country Conditions* 30 (May 2007), which indicated that children born overseas are "not . . . counted" for birth planning purposes when the parents return to China. The BIA further reasoned that the central government policy prohibits physical coercion to compel persons to submit to family planning enforcement. Moreover, enforcement efforts in Fujian have been described as "lax" or "uneven" in published reports and court decisions. *Id.* at 193. The BIA concluded that, at most, the evidence suggests that the applicant and his wife may face "sanctions and penalties" upon returning to China because of the births of their U.S. citizen children but that the evidence did not show that such sanctions and penalties would rise to the level of persecution.

Similarly, in *Matter of J- H- S-*, the BIA acknowledged that "China's system of using pressure and incentives to achieve family planning goals has to some extent included physical coercion." 24 I&N Dec. at 201. The BIA examined the 2007 profile, which noted "reports" of forced sterilizations in the Fujian Province, and mentioned the reference to the Changle City Family Planning handbook in the *Shou Yung Guo* decision. The BIA also cited to the Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *China Country Reports on Human Rights Practices—2006* (Mar. 6, 2007), which states that forced sterilizations and abortions, in violation of national law, continued to be documented in rural areas. The BIA concluded, however, that the applicant had failed to present sufficient evidence to prove a well-founded fear of future persecution in Fujian Province on account of having fathered two daughters there. Even assuming that the birth of the applicant's second daughter would be viewed as unauthorized, the BIA explained, the record

did not contain persuasive evidence that the birth would trigger enforcement activity in Fujian Province, where enforcement efforts were described most recently as "uneven." *Id.* at 202. The BIA also stated that there was no indication in the Second Circuit's reference in *Shou Yung Guo* to documents that reflect that the birth control measure imposed upon the birth of a second child in Changle City, Fujian Province is to forcible sterilization, as opposed to "sterilization." *Id.* at 203. On balance, the BIA concluded, "the evidence suggest[ed] that physical coercion to achieve compliance with family planning goals is uncommon and unsanctioned by China's national laws, and that the overall policy is much more heavily reliant on incentives and economically-based penalties." *Id.*

In the instant case, petitioners have questioned the reliability of the reports considered by the IJ but failed to provide the requisite specific, detailed facts showing that they have good reason to fear that they will be singled out for persecution. *See Ahmed v. Ashcroft*, 348 F.3d 611, 618 (7th Cir. 2003). Accordingly, the IJ's conclusion that petitioners did not have a well-founded fear of future persecution is supported by substantial evidence.

## III. Conclusion

For the foregoing reasons, we DENY the petition for review.

A true Copy:

      Teste:

 

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*