In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 07-1098

JEANNE N. T. OGAYONNE,

*Petitioner*,

*v.*

MICHAEL B. MUKASEY, Attorney General
of the United States,[1]

*Respondent*.

_____

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A98-131-188

_____

ARGUED OCTOBER 29, 2007—DECIDED JUNE 18, 2008

_____


Before BAUER, RIPPLE, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*.    The petitioner in this case, Jeanne Nadia Tambo Ogayonne, a native of the Central African Republic ("CAR"), seeks asylum, withholding of removal, and protection under the United Nations Convention Against Torture ("CAT"). She claims she will be

_____

[1] We substitute Michael B. Mukasey, the current Attorney General of the United States, as the Respondent in this action. *See* Fed. R. App. P. 43(c)(2).

persecuted or killed if she returns to the CAR, but we
reject Ogayonne's petition for asylum because we lack
jurisdiction over this claim. As the immigration judge ("IJ")
and the Board of Immigration Appeals ("BIA") concluded,
Ogayonne's filing was untimely and not justified by
extraordinary circumstances. We also conclude that there
was sufficient evidence to justify the denial of with-
holding of removal and relief under the CAT. Accord-
ingly, we deny Ogayonne's petition for review.

## I.  BACKGROUND

The Central African Republic is a former French colony
in the heart of Africa, surrounded by Chad, Sudan, the
Democratic Republic of the Congo, the Republic of the
Congo, and Cameroon. It has a population of about 4.4
million people and is slightly smaller than Texas.

By all accounts, the CAR has been a politically turbulent
place ever since it gained independence in 1960. The
country has experienced a series of military coups and
dictatorships, including one led by General André
Kolingba in 1981. Although General Kolingba lost power
after the country held elections in 1993, he attempted
another coup in May 2001, this time against President
Ange-Félix Patassé. The Patassé regime violently sup-
pressed the coup attempt, and Kolingba and his fol-
lowers were sentenced to death in absentia. Kolingba
fled to Uganda, and many members of Kolingba's tribe,
the Yakoma, were killed.

Jeanne Ogayonne was born on April 26, 1984, in the CAR.
Although Ogayonne admits she has never met André
Kolingba, she claims to be his sister-in-law. Like Kolingba,
Ogayonne and her family belong to the Yakoma tribe,

which makes up about 3% of the CAR population. They are all also members of the Central African Democratic Party, *a.k.a.*, Rally for Democracy.

Although Ogayonne does not claim to have suffered from violence or persecution while in the CAR, her parents were not so lucky. Ogayonne's father René Félix died in 1985, purportedly from being poisoned after a political meeting. Ogayonne's mother died of a blood disease in 1997 because she was unable to get treatment due to the politically unstable situation in the CAR.

On October 30, 2000, when she was sixteen years old, Ogayonne came to the United States on a student visa that permitted her to attend the Dayton Christian School in Dayton, Ohio. Later, she moved with her brother and his family to attend Richmond High School, a public school in Richmond, Indiana. Apparently, Ogayonne did not know that her visa did not allow her to change schools.

In February 2002, the director at Richmond High School told Ogayonne's brother that Ogayonne had to go either to a private school or to college to renew her visa. Ogayonne completed her junior year at Richmond in May 2002 and explored the possibility of going to college. In January 2003, she talked to personnel at Indiana University-Purdue University Indianapolis ("IUPUI"), who told her it would be impossible for her to renew her visa because it had expired six months earlier.

Following Kolingba's failed coup, in which members of Ogayonne's family were killed, Ogayonne decided not to return to the CAR and applied for asylum in December 2003. The United States Citizen and Immigration Services ("USCIS") returned her application as incomplete

on three occasions. Her application was finally accepted on April 14, 2004. On about May 17, 2004, the Department of Homeland Security issued a Notice to Appear, alleging that Ogayonne could be removed from the country for not attending the school indicated on her visa. In pleadings submitted on June 3, 2004, Ogayonne conceded her removability and stated she intended to pursue applications for asylum and related relief, or alternatively, voluntary departure.

On May 11, 2005, an IJ held a hearing on Ogayonne's various applications for relief. During the hearing, Ogayonne testified that because of her relation to André Kolingba, she was afraid of being raped, detained, or killed if she returned to the CAR. Indeed, she stated that her three sisters had sought refugee status elsewhere. Ogayonne also introduced a letter from her sister Sophie, a refugee in Senegal at the time, which stated that although Sophie had not obtained any "official paperwork or marriage license," she was a traditional "second wife" of André Kolingba. Additionally, Ogayonne introduced an article indicating that there had been an assassination attempt on Kolingba's life two months before the hearing. The IJ considered letters submitted by Ogayonne's other siblings and other evidence indicating that the CAR was a dangerous place prone to chronic instability.

The IJ also introduced into evidence several documents from his own Internet research. The documents included a March 14, 2005, article from BBC News entitled "Results due in landmark CAR vote," a 2005 Amnesty International document describing events in the CAR, and three articles from the United Nations Office for the Coordination of Humanitarian Affairs. The documents

stated that Kolingba had apologized for his role in the failed coup against Patassé; that Kolingba and other backers of the coup had been granted amnesty and had their death sentences lifted by current President François Bozizé (who had overthrown Patassé in 2003); that Kolingba had returned to the CAR with 800 soldiers; and that he had run a public campaign for president. Neither Ogayonne's counsel nor the government objected to the introduction of these documents. The IJ also questioned Ogayonne about the information in these documents and gave Ogayonne's counsel an opportunity (which he declined) to ask questions about the documents.

Later that day, the IJ issued an oral decision denying Ogayonne's applications for asylum, withholding of removal, and protection under the CAT, and granting her request for voluntary departure. After Ogayonne filed a timely notice of appeal, the BIA affirmed the IJ's decision and dismissed her appeal. Ogayonne then filed her petition in this court.

## II. ANALYSIS

### A. Standard of review

Because the BIA adopted, affirmed, and supplemented the IJ's decision denying Ogayonne's claims for asylum, withholding of removal, and relief under the CAT, we review the IJ's decision and the additional reasoning in the BIA opinion. *Mema v. Gonzales*, 474 F.3d 412, 416 (7th Cir. 2007). We review these claims under the substantial evidence standard and will not reverse unless a petitioner can demonstrate that the evidence not only supports that conclusion, but compels it. *Mabasa v. Gonzales*, 455 F.3d 740, 744-45 (7th Cir. 2006). In particular, we look to see if "the BIA's determination was sup-

ported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* at 744 (internal quotation marks omitted).

### B. Asylum claim

8 U.S.C. § 1158(a)(2)(B) provides that an alien who is physically present in the United States and seeks asylum must show "by clear and convincing evidence that the application [for asylum] has been filed within 1 year after the date of the alien's arrival in the United States." An application may be considered even if the one-year filing deadline has passed if the applicant "demonstrates to the satisfaction of the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application." *Id.* § 1158(a)(2)(D).

8 U.S.C. § 1158(a)(3) provides, however, that "[n]o court shall have jurisdiction to review any determination of the Attorney General under [section 1158(a)(2)]." The statute has been amended recently to allow review of "constitutional claims or questions of law," 8 U.S.C. § 1252(a)(2)(D), but "discretionary or factual determinations continue to fall outside the jurisdiction of the court of appeals entertaining a petition for review." *Vasile v. Gonzales*, 417 F.3d 766, 768 (7th Cir. 2005). One such unreviewable decision includes "the BIA's factual determination that [an applicant] failed to file his asylum claim within one year and its decision that he failed to qualify for an extension of time." *Id.*

Ogayonne correctly notes that being an unaccompanied minor can be an extraordinary circumstance that delays the start of the one-year clock. *See* 8 C.F.R. § 1208.4(a)(5)(ii).

But even if we accept Ogayonne's claim that she first filed her asylum application in December 2003—that is, despite the fact that her application was not finally accepted by USCIS until April 2004—her application was still filed over eighteen months after she turned eighteen, well after the one-year deadline. Ogayonne argued before the IJ (as she argues now) that she received bad advice and did not know about her changed immigration status until January 2003, when she attempted to enroll at IUPUI; hence, she claims her December 2003 filing should be considered timely. But the IJ and BIA did not believe that these facts justified her late application. We lack jurisdiction to review this discretionary finding. *See Vasile*, 417 F.3d at 768-69.

## C. Withholding of removal claim

The Attorney General may not remove an alien to a country if he decides that the "alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). Because Ogayonne has not alleged, and the Attorney General has not found, that Ogayonne suffered past persecution, she is not entitled to a presumption that her life or freedom would be threatened in the future. *See BinRashed v. Gonzales*, 502 F.3d 666, 670-71 (7th Cir. 2007); 8 C.F.R. § 1208.16(b)(1)(i). So Ogayonne must demonstrate a "clear probability of persecution" by showing that it is more likely than not that she would be subject to persecution if returned to the CAR. *See Tariq v. Keisler*, 505 F.3d 650, 656 (7th Cir. 2007).

In deciding against Ogayonne on her withholding of removal claim, the IJ relied on documents that he had

introduced into evidence on his own initiative, in addition to documents introduced by the parties. Ogayonne did not object to the documents the IJ introduced but claims the IJ insufficiently considered certain documents she provided. We examine these issues in turn.

### 1.  The IJ did not err in relying on the documents he introduced into the record.

At first blush, it might seem problematic that the IJ decided to introduce evidence on his own, given that the relevant statutory and regulatory provisions suggest that an IJ may receive but not present his own evidence. *See, e.g.*, 8 U.S.C. § 1229a(b)(1) ("The immigration judge shall administer oaths, <u>receive evidence</u>, and interrogate, examine, and cross-examine the alien and any witnesses." (emphasis added)); 8 C.F.R. § 1240.1(c) (An "immigration judge shall <u>receive</u> and consider material and relevant evidence . . . ." (emphasis added)). And contrast § 1229a(b)(1) with its predecessor, which stated that the immigration judge "shall . . . determine the deportability of any alien, and shall administer oaths, <u>present and receive evidence</u>, interrogate, examine, and cross-examine the alien or witnesses." 8 U.S.C. § 1252(b) (amended in 1996) (emphasis added).

We need not dwell long on this issue as Ogayonne has not challenged the IJ's action here. We simply note that the IJ did not err in introducing these particular documents because they merely stated commonly acknowledged facts that were amenable to official notice. *See Kaczmarczyk v. INS*, 933 F.2d 588, 594 (7th Cir. 1991) ("We reiterate today that the BIA may take official notice of uncontroverted facts concerning political conditions in

asylum seekers' home countries . . . ."). And the IJ gave the parties an opportunity to respond to the documents that he entered and to question Ogayonne about the information contained therein. *See id.* at 590 (noting that asylum petitioners are entitled to an opportunity to respond to officially noticed facts); *see also* 5 U.S.C. § 556(e) ("When an agency decision rests on official notice of a material fact not appearing in the evidence in the record, a party is entitled, on timely request, to an opportunity to show the contrary."). Ogayonne's counsel neither objected to the documents nor suggested to either the IJ or the BIA that the documents were inaccurate or that they otherwise unfairly prejudiced Ogayonne. *Cf. Rehman v. Gonzales*, 441 F.3d 506, 509 (7th Cir. 2006) ("[C]ourts do not set aside agencies' decisions unless mistakes cause prejudice . . . ."). So even if Ogayonne had asked us to overturn the IJ's decision, she did not preserve a basis for us to do so. *See Capric v. Ashcroft*, 355 F.3d 1075, 1087 (7th Cir. 2004) ("An alien is required to raise and exhaust his remedies as to each claim or ground for relief if he is to preserve the right to judicial review of that claim.").

Additionally, we are not particularly troubled by the IJ's reliance on these documents because the relevant information was independently included in other properly admitted evidence. For example, Ogayonne testified that she knew Kolingba had returned to the CAR in March 2005 and had run for president and lost. And Ogayonne had already submitted a 2003 Amnesty International article describing the amnesty grant. So the IJ did not even need to rely on the documents he admitted to decide Ogayonne's claims the way he did.

**2. The record supports the decision to deny with-holding of removal.**

Ogayonne claims the IJ did not adequately consider various documents that Ogayonne introduced into the record. But the IJ's decision indicates that he did consider each of these documents; he just did not find they were sufficient to establish Ogayonne's withholding of removal claim.

Ogayonne first points to a 2004 State Department Country Condition Report that she provided describing the ongoing and seemingly interminable human rights abuses occurring in the CAR. Nothing in the report, however, suggests that the government is currently targeting André Kolingba or Yakoma tribe members. In fact, the report suggests the opposite, describing how the Patassé regime, which had sentenced Kolingba and his followers to death, was overthrown in Bozizé's 2003 coup. And as noted previously, other documents in the record demonstrate that Bozizé had amnestied Kolingba and allowed him to return to the CAR.

Ogayonne also points to an October 23, 2004, affidavit of Steve Snyder, a former Peace Corps volunteer who had served in the CAR. Snyder claimed that Ogayonne would be singled out for harassment and persecution due to her relation to Kolingba and her tribal membership. Snyder also claimed that the Patassé regime had oppressed the Yakoma people, who hail from the southern part of the CAR, and that President Bozizé might continue the oppression because he hails from the same northern region of the CAR as Patassé and "share[s] a similar incentive to remove Yakoma and other southerners from positions of power in the government and military."

Although the IJ did not address Snyder's testimony in detail, there was nothing Snyder said that would alter the outcome. First, the affidavit indicates that Snyder was a Peace Corps volunteer during 1985-1988 and that he had visited the CAR in 1996-1997. Given that these visits occurred quite some time ago, Snyder's on-the-ground knowledge was stale. More importantly, Snyder's affidavit was contradicted by evidence demonstrating that Bozizé has not continued Patassé's repression of the Yakoma people, given that Bozizé had amnestied Kolingba and many of his followers.

Finally, Ogayonne points to a BBC News article entitled, "CAR 'assassination attempt' fails," which describes a shoot-out that occurred outside Kolingba's house in March 2003, after he had returned to the CAR and lost the presidential election. Ogayonne further notes that unlike Kolingba, she will not have the protection of soldiers if she is sent back to the CAR; hence, the situation might be more dangerous for her.

As the IJ noted, there is a dispute whether this was an "assassination attempt"; General Kolingba's spokesman described it as such, but the government claimed it was just a "misunderstanding" among soldiers. Given that the CAR is by all accounts a rather dangerous place, it is not clear that the government was behind the "assassination attempt" or was targeting Kolingba. *Cf. Chakir v. Gonzales*, 466 F.3d 563, 570 (7th Cir. 2006) ("The acts of private citizens do not constitute persecution unless the government is complicit in those acts or is unable or unwilling to take steps to prevent them."). More importantly, the IJ further observes—correctly we believe—that "it's difficult to accept the proposition that [Ogayonne] is at greater risk than the very person on whom she

is relying as a basis for her claim, particularly where that person has a much higher public profile than [Ogayonne] does . . . . " Indeed, Ogayonne admitted during the hearing that she had never even met or contacted Kolingba. Hence, we agree with the IJ that it is hard to believe that Ogayonne would be closely identified with Kolingba if she were sent back to the CAR. This, combined with the apparent reduced threat that General Kolingba faces, makes withholding of removal inappropriate.

### D.  Convention Against Torture claim

To receive protection under the Convention Against Torture (CAT), an alien must demonstrate that it is more likely than not that she would be tortured if removed to the proposed country. *See* 8 C.F.R. § 1208.16(c)(2). Ogayonne only mentions the CAT as an argument heading, makes no points on this issue, and does not claim any past torture. Accordingly, this perfunctory argument is waived. *Campania Mgmt. Co. v. Rooks, Pitts & Poust*, 290 F.3d 843, 852 n.6 (7th Cir. 2002). Moreover, the same reasons that militated against withholding of removal apply just as strongly here, so the IJ did not err in denying Ogayonne's CAT application.

### E.  Due process claim

Ogayonne also claims the IJ violated her due process rights in two ways. First, Ogayonne alleges the IJ "stopped counsel from pursuing a line of questioning concerning the death of [Ogayonne's] mother due to fear of taking her to the hospital." When asked about the relevance of

this testimony, Ogayonne's counsel replied, "I am trying to tie this in to the fact that the treatment she did or did not receive at the hospital was greatly [sic] because of her relationship with Andre Kolingba and also as a member of the [Yakoma] tribe."

Aliens are entitled to due process of law, which requires a meaningful opportunity to be heard on an application for asylum. *Kerciku v. INS*, 314 F.3d 913, 917-18 (7th Cir. 2003). This means an IJ cannot "bar[ ] complete chunks of oral testimony that would support the applicant's claims" such as by not allowing an applicant "to present corroborating testimony from family members about his past persecution." Nonetheless, an IJ can "limit[ ] the extent of some testimony or frequently interrupt[ ] the applicant's presentation" without violating due process. This is because such limitations "serve to focus the proceedings and exclude irrelevant evidence." *Id.*

Here, Ogayonne's main argument is that she would be subject to persecution if she were sent back to the CAR because of her ethnic background and her alleged relation to André Kolingba. Ogayonne's mother died four years before Kolingba's failed coup attempt, and three years before Ogayonne came to America. Although the IJ recognized that this evidence might help show a long-standing prejudice against Ogayonne's family, the IJ did not err in concluding that this testimony had limited relevance. Given that Ogayonne's basis for asylum and withholding of removal hinged primarily on Kolingba's status in the CAR, it made sense for the IJ to focus the proceedings on that issue and not spend time on this tangent.

Second, Ogayonne claims the IJ injected himself in an "adversarial" manner by engaging "in a cross-examination,

and an argumentative one at that, of [Ogayonne]." The transcript shows that the IJ questioned Ogayonne regarding the Internet articles he had found. In response, she stated:

> The problem is the government. You know only what you read on the paper and on the [I]nternet. Well you only read what's on the Internet, but you don't know what's really happening in Africa, it's much worse.

Ogayonne also claimed that "when Kolingba returns to Central Africa he is protected, he has guards. I have no one around me." The IJ later said:

> All right. Well, I just think you should know that there is this information and it should be part of the record and I'll mark it as Exhibit 8 and I'll give either side an opportunity . . . to question you further about this, before I decide what action to take on it. I have given both sides the reports from which the information on which I predicated these questions was derived.

Given that the IJ did not err in relying on the information in these documents, the IJ could "question [Ogayonne] provided that his conduct [did] not demonstrate impatience, hostility, or a predisposition against [Ogayonne's] claim." *Huang v. Gonzales*, 403 F.3d 945, 948 (7th Cir. 2005). Here, the IJ began questioning Ogayonne only after Ogayonne's counsel said he was done with his direct examination. The IJ's questioning appears to have been brief and targeted. And the issue on which the IJ questioned Ogayonne—whether the amnesty of Kolingba had negated the threat to Ogayonne—directly related to Ogayonne's applications for relief. Moreover, with-

out this questioning, this testimony might never have gotten into the record, as the government seems to have neglected this issue. *See Hasanaj v. Ashcroft*, 385 F.3d 780, 783 (7th Cir. 2004) ("[T]he fact that an IJ asks questions during the proceedings is helpful to develop the record and is better than a silent bench that says nothing throughout the proceedings and then denies the request for asylum because the petitioner did not provide sufficient evidence."). Accordingly, Ogayonne's due process rights were not violated.

### III.  CONCLUSION

The petition for review is DENIED.