**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 18, 2008
Decided November 24, 2008

**Before**

JOEL M. FLAUM, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 07-3948

| | |
|---|---|
| SARA ESPERANZA VALDEZ AVALOS, *Petitioner,* | Petition for Review of an Order of the Board of Immigration Appeals. |
| *v.* | No. A73 401 775 |
| MICHAEL B. MUKASEY, *Respondent.* | |

**O R D E R**

Sara Valdez Avalos, a citizen of Guatemala, fled to the United States in 2002 after she was raped by five men. More than a year later she applied for asylum and withholding of removal on the ground that her attackers had been guerillas in Guatemala's long-running civil war. The immigration courts concluded that her asylum application was time-barred, and denied her application for withholding after finding that the evidence did not support her contention that the rape was more than a random act of violence. Valdez petitions for review of the latter decision. Because the record does not compel the conclusion that Valdez is more likely than not to be persecuted if she returns to Guatemala, we deny the petition.

Valdez is in the United States illegally for the second time. She previously applied for asylum in May 1995 after entering without inspection earlier that year. In 1996 Valdez testified in that proceeding that, before fleeing the country, she had lived in northern Guatemala with her husband and nineteen-year-old son. According to Valdez, local guerillas would often steal food and animals from the family's ranch. She had heard that they wanted to recruit her husband, but neither she nor her husband were involved with the guerillas or any other political organization. But one night in November 1994, she said, a group of fifteen men in khaki uniforms and black masks, whom she believed were guerillas, broke down their door. While her son hid under a bed, the intruders struck and tied up Valdez, told her they would return to kill her, and kidnaped her husband. Valdez testified that she did not know why guerillas would want to target her husband. She had not seen him since and did not know if he was alive.

Fearing for her safety, Valdez said, she fled her home the day after the attack, moving south to Guatemala City and then to Mexico where she lived briefly before entering the United States. In the earlier proceeding Valdez testified that her son and several of her siblings were then living in Guatemala City, where they had not been bothered by guerillas. She also admitted that she was aware of the then-recent peace accord between the guerillas and the Guatemalan government. Nevertheless, Valdez asserted that she believed that the guerillas were looking for her and that she would not be safe in Guatemala.

The immigration courts found that Valdez had not established past persecution or a well-founded fear of future persecution and denied her application. She returned to Guatemala in July 1998 but came back to the United States in January 2002. In April 2003 she filed the application for asylum and withholding which is now before us. At her second removal hearing, Valdez recounted the details of her husband's kidnaping but this time testified that she believed her husband's family had been affiliated with the guerillas, who kidnaped him in retaliation for his refusal to join them. She had not made this assertion at her first removal hearing, and it is inconsistent with her affidavit in support of her most-recent asylum application, in which she states that her husband was kidnaped by "men from the army or from G-2."

At the second hearing Valdez testified that upon returning to Guatemala in 1998 she moved to a housing project in Villa Nueva, a city near Guatemala City and approximately eight hours from her former home, and she lived there without incident for the next three years. But one morning in October 2001, she said, five masked men in civilian clothes kidnaped her from a bus stop and drove her to an abandoned house, where they raped her. Valdez initially testified that the men did not speak to her, but then later recalled that when the men caught her, they asked: "[Y]ou are Sara, aren't you? The wife of Valdez." But her husband's surname is not Valdez, and this testimony contradicts Valdez's affidavit, in

which she states that the men "didn't talk at all." Valdez testified that she told police she was raped by "bad guys," and the police report she submitted as evidence confirms that authorities suspected the assailants were members of a drug gang. Because Valdez fled Guatemala twenty days later, she does not know if any arrests were ever made.

Valdez testified that she did not have any enemies and yet the men who raped her knew her name, and so she believed they were guerillas connected to her husband's 1994 disappearance. Again, however, her testimony contradicted her asylum application, in which she relates her suspicion that the unknown assailants were "with the army." Valdez's lawyer argued to the IJ that the rape must have been linked to the disappearance of Valdez's husband because, counsel insisted, there was "no rational explanation" for five men to gang rape a woman who is not "young and attractive."

Because Valdez did not apply for relief within a year of entering the United States, the immigration judge ("IJ") found her ineligible for asylum. The IJ also denied her application for withholding of removal. The IJ did not credit Valdez's testimony that her assailants addressed her by name, and instead the judge accepted her initial testimony and the statement in her affidavit that the men did not speak to her at all. And because there was no conversation, the IJ continued, there was no plausible reason to conclude that Valdez's rape in 2001 and her husband's disappearance were connected. The IJ concluded that Valdez had failed to establish past persecution on account of a protected ground—indeed, he found that there was no evidence that the rape was "anything more than random violence by a criminal gang." The Board of Immigration Appeals agreed that Valdez's asylum application was time-barred, and affirmed the IJ's conclusion that Valdez had failed to establish that the men who raped her had targeted her on account of a protected ground.

In her petition for review, Valdez challenges the IJ's adverse credibility determination and his conclusion that she was not persecuted on account of a protected ground. Valdez does not challenge the IJ's factual determination that her asylum application was untimely, nor would we have jurisdiction to review such a challenge. *See* 8 U.S.C. § 1158(a)(3); *Ogayonne v. Mukasey*, 530 F.3d 514, 519 (7th Cir. 2008). Because the Board affirmed the IJ's decision in a short order, we review the IJ's decision as supplemented by the Board. *See Bosede v. Mukasey*, 512 F.3d 946, 950 (7th Cir. 2008).

We review a decision denying withholding of removal under the substantial-evidence standard, and will overturn the immigration courts only if the record compels such a result. *Ogayonne*, 530 F.3d at 518-19. To qualify for withholding of removal, an applicant must demonstrate a clear probability that her life or freedom will be threatened in her home country on account of a protected ground. *See* 8 U.S.C. § 1231(b)(3)(A), (C); *Irasoc*

*v. Mukasey*, 522 F.3d 727, 729 (7th Cir. 2008). An applicant can meet her burden by establishing that she suffered past persecution in the country of removal—which raises a rebuttable presumption that her life or freedom will be threatened if she returns—or that there is a clear probability of future persecution. *Guardia v. Mukasey*, 526 F.3d 968, 971 (7th Cir. 2008).

In denying Valdez's application, the IJ explained that Valdez had failed to meet her burden of proof because her testimony was not credible. We give substantial deference to an adverse credibility determination, which will be sustained absent extraordinary circumstances. *Song Wang v. Keisler*, 505 F.3d 615, 620-21 (7th Cir. 2007). As he was required to do, the IJ supported the determination with "specific, cogent reasons" bearing "a legitimate nexus to the finding." *See Adekpe v. Gonzales*, 480 F.3d 525, 530 (7th Cir. 2007). The IJ cited several internal inconsistencies in Valdez's testimony, as well as discrepancies between that testimony and Valdez's written asylum applications. For example, Valdez's testimony that when her rapists caught her they asked if she was Sara Valdez contradicts both her earlier testimony that the men never spoke and her affidavit in which she states that the men "didn't talk at all." *See Song Wang*, 504 F.3d at 621 (noting that significant discrepancies between versions of an alien's claim are a legitimate basis for an adverse credibility finding); *Singh v. Gonzales*, 487 F.3d 1056, 1060 (7th Cir. 2007) (upholding IJ's adverse credibility finding where alien's oral testimony contradicted earlier sworn statement on issue going to heart of claim). The IJ also found significant Valdez's testimony that she told the police she was attacked by "criminals" (as opposed to guerillas), which is also reflected in the police report she submitted with her asylum application, which states that the assailants were leaders of a drug gang. Additionally, the IJ explained that the vagueness of Valdez's testimony about her husband's kidnaping further undermined her credibility. *See Aung v. Gonzales*, 495 F.3d 742, 744, 746 (7th Cir. 2007) (upholding adverse credibility finding based on IJ's opinion that alien's testimony regarding significant events was "'vague and confusing'").

The IJ also considered evidence of country conditions in assessing the plausibility of Valdez's testimony. *See Capric v. Ashcroft*, 355 F.3d 1075, 1085 (7th Cir. 2004). Specifically, he noted that the guerillas reached a peace accord with the Guatemalan government in 1996 and became part of the political process, and that there is no evidence that they actively target persons who resisted them in the past. Also significant to the IJ was the State Department report on Guatemala, which notes that random sexual violence against women occurs there at alarming rates, and the police report Valdez submitted, which acknowledges that criminal gangs threatened all of Villa Nueva. And, finally, the IJ found Valdez's testimony implausible given that Valdez was raped in a city eight hours away from where her husband had been kidnaped, and that she had lived in Villa Nueva for over three years without any trouble. The IJ properly assessed the "internal consistency, detail, and

plausibility" of Valdez's claim and substantial evidence supports his conclusion that her testimony was not credible.  *See Capric*, 355 F.3d at 1085.

Because Valdez did not provide credible testimony, she was required to provide corroborating evidence in order to meet her burden of proof.  *See Aung*, 495 F.3d at 746.  But as the IJ noted, Valdez failed to provide any evidence that her rapists were associated with her husband's kidnapers.  Refugees often are unable to provide direct proof of their persecutor's motivation, but they must produce "*some* evidence" that they were targeted on account of a protected ground.  *See INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992); *Li v. Gonzales*, 416 F.3d 681, 685 (7th Cir. 2005).  Although Valdez argues that it is "very hard to come up with a different explanation" for her rape than the one she has offered, substantial evidence supports the IJ's conclusion that Valdez was a victim of the random sexual violence plaguing Guatemala.  The petition for review is DENIED.