In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-3713

XIAO JUN LIANG,

*Petitioner,*

*v.*

ERIC H. HOLDER, JR.,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A095-928-809

ARGUED APRIL 19, 2010—DECIDED NOVEMBER 24, 2010

Before BAUER and SYKES, *Circuit Judges*, and GRIESBACH, *District Judge.**

GRIESBACH, *District Judge.* Xiao Jun Liang, a citizen of the People's Republic of China, arrived in the United States without a valid entry document on July 30, 2003. She applied for asylum, withholding of removal and

---

* Hon. William C. Griesbach, District Judge for the Eastern District of Wisconsin, sitting by designation.

protection under the Convention Against Torture ("CAT"), alleging that she was mistreated by the Chinese government due to her membership in the Democratic Party. An Immigration Judge ("I.J.") denied her applications, and the Board of Immigration Appeals (the "BIA" or "the Board") affirmed the decision on March 1, 2004.

Despite the denial of her applications, Liang was not removed from the United States; nor did she leave the country voluntarily. On August 24, 2009, almost five-and-a-half years after entry of the final order of removal, Liang filed a motion to reopen the proceedings and again apply for asylum, withholding of removal and CAT protection, this time on the ground that she feared persecution in the form of forced abortion and sterilization under China's "one-child rule." The Board denied Liang's motion to reopen on October 16, 2009, and she petitioned this court for review. Finding no abuse of discretion by the Board, we deny Liang's petition.

## I. Background

As noted above, Liang initially sought asylum and related relief shortly after her arrival in the United States on July 30, 2003, on the ground that she was subjected to mistreatment because of her membership in the Democratic Party. Liang was nineteen years old at the time. At the hearing on her application, the I.J. questioned Liang about her claimed fear of political persecution and found her not credible. Liang testified that she had joined the Democratic Party in 1998, was accepted as a member and was sworn in at the end of 2001. She did not

know the platform of the Party, however, and did not have a membership card or any other proof of membership. The I.J. noted there was no indication the party referred to by Liang exists. The I.J. stated that he had reviewed the reports issued by various organizations, particularly the U.S. State Department and the United Kingdom, and asked Liang whether she recognized any of the political organizations listed in those reports which were known to suffer persecution. Liang did not recognize any of them. Thinking that she may have meant the China Democracy Party, the I.J. asked Liang if she recognized the names of any of its leaders, but she again said she did not. Transcript of Oral Decision of the I.J. at 2, 3.

The I.J. also found that Liang's account of how she had arrived in the United States was not credible. Liang testified that on December 23, 2001, she was caught by the authorities distributing pamphlets for the propaganda section of the Party, beaten all over her body and woke up at home. She testified she remained in hiding from the end of 2001 until July of 2003, when she was smuggled to the United States. However, she was extremely vague about how she traveled to the United States. She did not know if her parents paid a smuggler or what her itinerary was. As recounted by the I.J., Liang testified she traveled through Yunan Province from her home in the City of Fuzhou located in Fujian Province, then entered Laos and used a boat to arrive in Thailand. She testified that she arrived at Chicago's O'Hare International Airport on a flight from South Korea. She maintained that she boarded the flight in

South Korea after she received a passport from Singapore, which she then lost or "ripped up" on the flight before she arrived in the United States. *Id.* at 2-5.

At the conclusion of the hearing, the I.J. orally denied Liang's applications. He concluded it was almost certain that Liang did not belong to the China Democracy Party since she was unaware of its activities, its leaders and what had happened to them, or when it was founded. Her testimony was inconsistent with the statement she initially gave at the airport upon her arrival in the United States, and her account of how and why she left her home in Fujian Province was vague and implausible. Noting that the existence of a smuggling ring in Fujian Province was a "well-established fact" and the average fee for smuggling someone into the United States from China, according to official reports, was between $35,000 and $50,000, the I.J. concluded:

> I think it is most unlikely, in fact, probably impossible for the respondent to have made the trip she described on her own. I think the respondent, when questioned by the Court, has given misleading information when she was asked direct questions about how she came here and why she came here. I am convinced that the respondent's presence in the United States had nothing to do with any political activities of any kind and it does have to do with her family's and her desire to find work in the United States.

*Id.* at 7. The Board affirmed without opinion on March 1, 2004, making the I.J.'s decision the final agency decision. Liang did not seek further review.

On August 24, 2009, Liang filed a motion to reopen the proceedings, alleging that she now feared persecution under China's one-child policy. *See* 8 U.S.C. § 1101(a)(42)(B) ([A] person who has a well founded fear that he or she will be forced to [abort a pregnancy or to undergo involuntary sterilization] or subject to persecution for such failure, refusal or resistance shall be deemed to have a well founded fear of persecution on account of political opinion."). Liang alleged that since her last hearing she had married Guihua Lin, also a citizen of China, and given birth to a daughter. At the time she filed her motion to reopen, Liang was also pregnant with her second child whose due date was on or about November 15, 2009. (Liang later gave birth to a second daughter in late October 2009.) Liang also alleged that since her hearing on her initial application for asylum, conditions in China had changed. She claimed that she had obtained evidence that there had been an increase in enforcement of China's family planning policy through forced abortions and forced sterilization procedures. Having violated China's family planning policy by becoming pregnant with a second child, Liang claimed that China's increased enforcement of the policy gave rise to a well-founded fear of persecution if she returned.

In her affidavit in support of her motion, Liang recounted the dates of her marriage, the birth of her first child, and the expected birth date of her second child. Liang also noted that both she and her husband desired to have additional children. Liang stated that in telephone conversations with her family in China, she had

learned that over the past year the Chinese government had increased the intensity of its enforcement of the Family Planning Law in her home city of Fuzhou in Fujian Province. Family members had told her of several incidents in which women who had given birth to a second child were forcibly sterilized. She had also been told of one woman who was forced to abort her second child and was later sterilized because she became pregnant during a required waiting period.[1] Liang stated her father-in-law had gone to the local family planning office and inquired about their current practice. He was told that couples with one child were targeted for IUD insertions; couples with two children were targeted for sterilization and subjected to monetary penalties. Liang stated that her pregnancy with a second child so soon after the birth of her first child and without a birth permit was a serious violation of China's family planning law, even though her children were born overseas. Once she and her husband arrive home, they will be required to register their children in order for them to receive schooling or medical care. Her children will then be considered Chinese citizens, and she will be forced to undergo sterilization. It was to avoid persecution in the form of such forced sterilization that Liang claimed she was seeking the protection of the United States.

---

[1] According to Liang, some women whose first child is a girl may be granted a birth permit for a second child after a four-year waiting period.

Along with her affidavit, Liang submitted numerous other documents, some of which were specific to her case, such as letters from her father and father-in-law describing the events she recounted in her affidavit. Liang also included an April 2009 notice from the Qianyang Village Committee of Fuzhou City Mawei District Tingjiang Town. The notice, which appears to have been sent in response to her husband's inquiry about the family planning policy, states that her pregnancy is in violation of China's Nationality Law and directs Liang and her husband to report to the Family Planning Office within one week after her return to China for an abortion or, if she has already given birth, sterilization. The notice also indicates she is to pay a Social Compensation fee between 60% and 300% of annual income as a fine. Most of the documents submitted in support of Liang's motion, however, were copies of materials of a more general nature that fall roughly into four categories: (1) internal documents purportedly issued by Chinese provincial or local government family planning agencies relating to the implementation of the one-child policy; (2) excerpts from United States governmental reports such as the annual Country Reports issued by the Department of State, or from proceedings before Congress regarding conditions in China; (3) excerpts from reports of international organizations concerning China's family planning policy; and (4) various articles from the U.S. and international press reporting incidents of forced abortions and sterilizations in various provinces throughout the country.

Upon its review of the motion and supporting materials, the Board concluded that Liang had failed to meet her burden of showing that if the proceedings were reopened the new evidence would likely change the result. According to the Board, Liang failed to show that the family planning policy at the time of her initial hearing differed significantly from the current policy. The Board noted that the 2008 State Department *Country Reports On Human Rights Practices* indicated that the Chinese government has "continued its decades-long family planning policy, relying upon education, propaganda, and economic incentives, as well as on more coercive measures, including psychological pressure and economic penalties; that enforcement of the family planning law varied significantly: that central government policy formally prohibited forced abortion or sterilization, though there were reports that local officials had used forced abortion and sterilization to meet family planning targets in violation of national policy." Board Decision at 3. Some of the materials Liang submitted, the Board noted, predated her 2003 hearing and did not support her claim of a material change in conditions within the country since that hearing. Other material had been previously considered by the Board and found not sufficient to show a material change in the family planning policy. Much of the documentation the Board found did not pertain to the area of Liang's home and thus was of little relevance, given the *Country Reports* statement that enforcement of the policy varies from place to place.

Addressing the accounts of forced sterilization described in Liang's affidavit and the letter from her

father, the Board observed that such "anecdotal evidence . . . does not suffice to show that the family planning policy has materially changed since the hearing below," since "accounts of isolated tragic events in documented reports, without more, do not necessarily indicate that any one person is at potential risk of that harm." *Id.* Additionally, the Board noted that Liang had not shown that her situation as the mother of a United States citizen child who is expecting a second child is similar to the situations of the women who were sterilized after bearing children in China. The Board stated it gave little weight to unsworn relatives' statements that describe the experiences of others and were apparently prepared for the purpose of litigation.

Turning to the notice to Liang and her husband from the village committee, the Board concluded it was "entitled to virtually no weight, particularly in view of the prior adverse credibility finding." *Id.* at 4. The notice was unsigned and had not been authenticated pursuant to 8 C.F.R. § 1287.6, and the Board noted that the May 2007 Department of State *Profile of Asylum Claims and Country Conditions*, of which it took administrative notice, described widespread fabrication and fraud in documents from Fujian Province. The Board further noted that according to Liang's own evidence, village committees did not have authority to make family planning decisions, and it questioned why her husband would choose to bring the couple's situation to the attention of village officials if they truly feared mistreatment. Finally, as to the various newspaper articles Liang submitted, the Board noted that it gave

less weight to anecdotal media accounts than to the more recent Department of State *Profile* and *Country Reports*. *Id.*

The Board also concluded that Liang had failed to make a prima facie showing that she would be subjected to economic or other harm amounting to persecution. To the extent she sought reopening for CAT protection, the Board noted that her motion was untimely and she had failed to make a prima facie showing of a probability of torture by or with the acquiescence of a government official. Finally, the Board concluded that Liang had not shown an "exceptional" situation that would warrant the exercise of the Board's limited discretion to reopen *sua sponte*. It thereupon denied Liang's request to reopen.

## II. Discussion

Generally, a motion to reopen removal proceedings must be filed within 90 days of the date of the final administrative order. 8 U.S.C. § 1229a(c)(7)(C)(i). Here, there is no dispute that Liang's motion was filed beyond the 90-day deadline. Her motion was filed on August 24, 2009, more than five years after the motion was due. It was therefore untimely.

There is no time limit, however, if the basis of the motion is to apply for asylum "based on changed country conditions arising in the country of nationality or the country to which removal has been ordered . . . ." *Id.* § 1229a(c)(7)(C)(ii). In assessing such a motion, it is im-

portant to note the distinction between changes in country conditions and changes in personal conditions. While a change in *country* conditions can warrant reopening removal proceedings after the 90-day time limit has expired, a change in the applicant's *personal* conditions will not. This is because an alien can change his or her personal conditions over time. "It makes no sense to allow an alien who manages to elude capture by the immigration authorities for years after he has been ordered to leave the country, and has exhausted all his legal remedies against removal, to use this interval of unauthorized presence in the United States to manufacture a case for asylum." *Chen v. Gonzales*, 498 F.3d 758, 760 (7th Cir. 2007) (citing *Wang v. BIA*, 437 F.3d 270, 274 (2d Cir. 2006)).

From the foregoing, it follows that the facts that Liang had gotten married, given birth to one child, and was pregnant with another since her previous hearing do not constitute grounds to reopen the proceedings. These events represent changes in her personal conditions. *See Zhao v. Gonzales*, 440 F.3d 405, 407 (7th Cir. 2005) ("[T]he birth of Zhao's children is merely a change in 'personal circumstances' in this country."). In order to reopen her removal proceedings, Liang was required to show that a material change had occurred in the conditions within China. In an effort to meet this burden, Liang alleged that China's "one-child" policy was being enforced more stringently in her home province than when she first applied for asylum. The Board concluded that the materials she submitted failed to show that either China's family planning policy or the enforce-

ment of it had materially changed and that, in any event, Liang had failed to make a prima facie showing of eligibility for relief. It is this decision we are called upon to review.

"Motions to reopen are comparable to motions for rehearing or for a new trial, and thus are 'strongly disfavored.'" *Fessehaye v. Gonzales*, 414 F.3d 746, 752 (7th Cir. 2005) (citing *I.N.S. v. Doherty*, 502 U.S. 314 (1992)). Indeed, this is especially true in immigration proceedings "where, as a general matter, every delay works to the advantage of the deportable alien who wishes merely to remain in the United States." *Doherty*, 502 U.S. at 323. Because the Board has "broad discretion" in this area, its decisions are reviewed under the "deferential, abuse-of-discretion standard of review." *Kucana v. Holder*, ___ U.S. ___, 130 S.Ct. 827, 834 (2010); *Juarez v. Holder*, 599 F.3d 560, 565 (7th Cir. 2010). Under this "highly deferential" standard, we will uphold the Board's decisions to deny Liang's motion to reopen "unless it was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group." *Mansour v. I.N.S.*, 230 F.3d 902, 907 (7th Cir. 2000); *Pelinkovic v. Ashcroft*, 366 F.3d 532, 536 (7th Cir. 2004).

A major obstacle to Liang's motion to reopen her removal proceedings based on changed country conditions was the fact that China's "one-child" policy did not represent a change in the country's conditions. The one-child policy is not new; in fact, it is more than

thirty years old. *See Stanford M. Lin, China's One-Couple, One-Child Family Planning Policy as Grounds for Granting Asylum*, 36 Harv. Int'l L.J. 231, 234-35 (1995). It was in response to China's vigorous enforcement of the policy and the Board's holding in *In re Chang*, 20 I. & N. Dec. 38, 43 (BIA May 12, 1989), that China's one-child policy was not "on its face persecutive" that Congress expanded eligibility for asylum to expressly include fear of coercive population control measures such as forced sterilization and abortion as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C, 110 Stat. 3009, 3009-546. *See Ke Zhen Zhao v. U.S. Dep't of Justice*, 265 F.3d 83, 91-92 (2d Cir. 2001) (discussing background to change in law). Thus, unless Liang could show that China's enforcement of the policy had become more stringent in her province since her last hearing, she could not prevail. Moreover, to make out a prima facie case, Liang was required to show a "reasonable likelihood" of establishing eligibility for asylum (or withholding of removal or CAT protection) if the case were reopened. *Kay v. Ashcroft*, 387 F.3d 664, 674 (7th Cir. 2004).

In holding that Liang had failed to show that the family planning policy at the time of her hearing in 2003 differed significantly from the current policy, the Board noted that the 2008 Country Reports for China indicate that "the Chinese government has continued to implement its decades-long family planning policy, relying upon education, propaganda, and economic incentives, as well as more coercive measures, including psychological pressure and economic penalties . . . ." Board

Decision at 3. It should go without saying that a continuation of a policy is not a change. The Board acknowledged that the Country Report also stated that enforcement of the policy varied significantly throughout the country and that, while the central government policy formally prohibited forced abortion or sterilization, there were reports that local officials had used such tactics in violation of official policy to meet family planning targets. *Id.* Yet the Board found the materials submitted by Liang in support of her claim of a material change in circumstances unpersuasive. In its decision denying Liang's motion, the Board explained why.

Some of the materials submitted by Liang in support of her motion predated the 2003 hearing before the I.J. These included: (1) excerpts from China's 1986 entry and exit control law; (2) the 1999 Chan Le City Family Planning Q&A Handbook; and (3) the 2002 Population and Family Planning Regulation of Fujian Province. This material could have been relevant had it demonstrated that the rules governing China's population policy or their enforcement were more lenient at that time than they are today. But that is not what the material suggests. Instead, to the extent it is relevant at all, the pre-2003 material Liang submitted suggests that the basic rules governing China's population policy and its enforcement have not materially changed.

Liang also submitted documents describing population control policies and their enforcement in cities, towns and provinces other than her native Fuzhou City in Fujian Province. For example, she submitted a family

planning notice, social compensation fee schedule, and other materials concerning population control from other towns and cities. She also offered multiple newspaper articles describing coercive enforcement measures in Zhejiang Province, Guanxi Province, and other towns or counties outside of Fuzhou City. The only articles relating to Fuzhou City refer to an increase in enforcement efforts which were intended to counter an anticipated baby boom in 2007, the year of the "golden pig," considered an auspicious year to have a child. (A.R. 410; 413.) Given the statement of the more recent State Department Country Reports that enforcement of the family planning policy varied over time and from place to place, however, the Board concluded these materials did not pertain. It is also noteworthy that the articles fail to indicate whether similar enforcement efforts took place prior to 2003. Absent evidence of China's enforcement efforts prior to Liang's original hearing, it is impossible to conclude that the offered evidence shows a change in country conditions.

In fact, the only evidence Liang references in her brief that specifically addressed whether enforcement of China's family planning policy had changed was her own affidavit in which she stated that "[i]n phone contacts with my family in China, I was told in the past year that the Chinese government increased the tensity [sic] of the enforcement of the Family Planning Law." Liang Aff. ¶ 4. But of course, the Board was not required to give any weight to her own statement since it was based on second-hand accounts and not her personal knowledge. *See Lin v. Holder*, ___ F.3d ___ (7th Cir. 2010)

("[W]e cannot disagree with the Board's determination that the items were unreliable because they were not based on personal knowledge."). This is particularly true in light of the Board's prior adverse credibility finding. *See Huang v. Mukasey*, 534 F.3d 618, 622 (7th Cir. 2008) ("His own and his wife's affidavits, and unauthenticated and possibly fraudulent documents purportedly from the church and the village government, were not evidence that could be assumed to be uncontaminated by his demonstrated propensity to lie to obtain asylum.").

Liang argues that the Board failed to properly evaluate the letters from her father and father-in-law which recounted several instances of what were described as forced sterilizations and a forced abortion performed on local women who had violated China's family planning policy. But again, the Board was not required to accept these unsworn, second-hand descriptions of the experience of others. Moreover, none of the incidents that are described involved a forced sterilization or abortion performed on a parent who returned to China either pregnant or with children born abroad. Nor was there any indication from the copies of sterilization and abortion certificates that accompanied the letters that the described procedures had been coerced. Liang's statement that these procedures were coerced does not make them so. Finally, even if the incidents described by Liang's father and father-in-law did involve coerced sterilizations, it is difficult to see how it would constitute evidence of changed country circumstances. *See Chen v. Gonzales*, 489 F.3d 861, 862 (7th Cir. 2007) ("Affidavits describing some auto accidents or shootings in Illinois

would not demonstrate that the risk from these events in Illinois is substantial. Likewise affidavits relating personal experiences or tales about sterilizations in Fujian would not establish that a person in Chen's position faces a material risk that this would happen to her.").

Liang relies heavily on the notice from the Qianyang Village Committee and criticizes the Board's refusal to accord it any weight based on the I.J.'s finding that she was not credible at the previous hearing. But the Board offered more than the adverse credibility finding in support of its rejection of the village notice. The Board noted that the notice was unsigned and had not been properly authenticated pursuant to 8 C.F.R. § 1287.6. The Board questioned why Liang's husband would choose to bring to the village officials' attention the couple's situation and took administrative notice of the May 2007 *China Profile of Asylum Claims and Country Conditions* issued by the United States Department of State which described "widespread fabrication and fraud in documents from Fujian Province." Board Decision at 4. Finally, the Board noted that the village notice specifically references the national law which expressly prohibits forced abortion and sterilization. *Id.* Under the circumstances, we cannot say that its rejection of the notice was arbitrary or unreasonable.

Liang cites this Court's decision in *Xiu Zhen Lin v. Mukasey*, 532 F.3d 596 (7th Cir. 2008), and various cases from other circuits in support of her contention that the Board abused its discretion in denying her motion to reopen. In *Lin* the Court found that the 2006 State De-

partment Country Report included a "stronger state-ment" regarding the enforcement of the family planning policy than found in the Country Report for 2001, the year in which the petitioner in that case was ordered removed. 532 F.3d at 597. The petitioner in *Lin* also sub-mitted a document similar to the village notice Liang submitted in this case indicating the petitioner would be targeted for sterilization upon her return. This Court found such evidence indicative of changed country conditions and concluded that the petitioner had carried her burden of showing changed country conditions that entitled her to reopen her removal pro-ceeding. Liang argues that the same conclusion follows here.

This case differs from *Lin*, however, in several important respects. Liang left China in 2003, and her initial hearing took place in October of that year. Given these facts, the relevant Country Report is the 2002 Report, not the 2001 Report which the Court found sug-gestive of lax enforcement of the policy. The 2002 Report stated there were "isolated incidents" of forced abortions and sterilizations and "the frequency of such cases was believed to be declining." The 2007 Report likewise stated that "[t]here continued to be sporadic reports of violations of citizens' rights by local officials attempting to reduce the number of births in their re-gion." Clearly, "isolated incidents" in 2002 and "sporadic reports" in 2007 hardly support an allegation of changed conditions—instead they indicate that conditions have remained largely the same. The more recent report contains no indication of any material change in enforce-

ment of the long-standing policy. Further, unlike the village letter in *Lin* the authenticity of which was conceded, the Board found the village notice offered by Liang wholly unreliable for the reasons described above. Finally, in *Lin* the government suggested that the imposition of a fine or social compensation fee for violating the family planning policy and the consequences for nonpayment could never amount to persecution. Here, by contrast, the Board acknowledged that "a showing of extreme economic deprivation may qualify as persecution," Board's Decision at 4, but noted that Liang had failed to make a prima facie showing that she would be subject to financial penalties that would have such an impact upon her.

Liang also cites several Eleventh Circuit decisions to support her position. In both *Yaner Li v. Gonzales,* 488 F.3d 1371 (11th Cir. 2007), and *Xue Xian Jiang v. Attorney General,* 568 F.3d 1252 (11th Cir. 2009), the court held that the petitioners met their burden for reopening because of changed country conditions by presenting personal affidavits, affidavits from relatives in China, State Department reports, Congressional testimony, and newspaper articles related to changed country conditions. In reopening the cases the Eleventh Circuit relied in part on the Board's own determination that the affidavits were not "incredible." Here, in contrast, the only affidavit Liang offered was her own based on second-hand information and burdened with the earlier adverse credibility finding.

At argument, counsel for Liang criticized the Board for failing to separately identify and discuss each and every

document submitted in support of her motion to reopen. In fact, however, the Board carefully catalogued and summarized the material counsel submitted. To the extent more detailed analysis was not provided, it seems clear the Board was hampered in its effort by number of documents counsel submitted and the manner in which the material was presented. As the Board noted,

> Counsel has filed voluminous materials that are not tabbed or consecutively paginated, and that are sometimes duplicative, poorly photocopied, reversed, truncated, and/or not single-sided copies. He has also submitted originals, which were not requested. Counsel has not complied with the filing guidelines in Chapter 3.3 of the Board's *Practice Manual*.

Board Decision at 2, n. 1. The Board also noted that many of the documents submitted bore little or no relevance to Liang's claims. It is difficult to fault the Board for failing to focus more directly on the handful of the 400 pages of documents submitted in support of the motion that counsel now claims are key. In any event, the Board is "not required to write an exegesis on every contention." *Iglesias v. Mukasey*, 540 F.3d 528, 531 (7th Cir. 2008). It is merely required to "consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Id.* The Board has done so here.

Finally, counsel emphasized at argument Liang's claim that China's policy had specifically become more

stringent with respect to violations of the one-child policy by Chinese citizens giving birth abroad. In particular, he cited an April 2007 report by Susanna Liu, a United States Customs Citizenship and Immigration Services investigator for the Guangzhou, China sub-office. The Liu Report was created in response to numerous requests from Department of Homeland Security offices seeking information regarding the treatment of foreign born children under China's population policy and condenses and evaluates numerous statements from the Fujian Province Population and Family Planning Commission ("the Commission"). (A.R. 141-150.) Commenting on this same report, the Third Circuit recently noted in an unpublished decision that "[a]lthough the Liu Report contains language indicating that foreign-born children may be counted against parents for purposes of family planning compliance, neither it nor the 2007 Country Report stated that sterilization would be the sanction for violating the family planning policy." *Yan Feng Pan v. Attorney General of U.S.*, 375 Fed. Appx. 252, 253 (3d Cir. 2010). Indeed, the May 2007 *China Profile of Asylum Claims and Country Conditions* referenced by the Board in its decision states:

> Consulate General officials visiting Fujian have found that coercion through public and other pressure has been used, but they did not find any cases of physical force employed in connection with abortion or sterilization. In interviews with visa applicants from Fujian, representing a wide cross-section of society, Consulate General Officers have found that many violators of the one-child

policy paid fines but found no evidence of forced
abortion or property confiscation.

*Profile* at ¶ 99. The *Profile* also noted that "U.S. officials in
China were not aware of the alleged official policy, at
the national or provincial levels, mandating the steriliza-
tion of one partner of couples that have given birth to
two children, at least one of whom was born abroad." *Id.*
at ¶ 110. In the face of this evidence, the Board's conclu-
sion that Liang had not shown a change in country con-
ditions was not an abuse of discretion.

## III. Conclusion

The Board gave a rational explanations for its conclu-
sion that Liang failed to show changed country condi-
tions in her home province since the time of her initial
asylum hearing. The decision did not inexplicably
depart from established policies or rest on an impermis-
sible basis. For these reasons, the petition for review
is DENIED.