# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 12-2242

JI CHENG NI, a/k/a JI ZHENG NIA,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A077-354-460

SUBMITTED DECEMBER 3, 2012*—DECIDED APRIL 26, 2013

Before WOOD and HAMILTON, *Circuit Judges*, and
DARROW, *District Judge*.**

---

* The parties have waived oral argument in the case and
thus the appeal is submitted on the briefs and record. See FED.
R. APP. P. 34(a)(2)(C).

** The Honorable Sara Darrow, Judge of the United States
(continued...)

WOOD, *Circuit Judge.* Ji Cheng Ni came to the United States in 2001 from his home in Fujian Province, China. An Immigration Judge ordered him removed in 2003, and his subsequent appeals were unsuccessful. See *Ni v. Gonzales*, 134 F. App'x 977 (7th Cir. 2005). Despite that order, Ni managed to remain in the United States, and he has since started a family. In 2011, following the birth of his second child, Ni moved to reopen his removal proceedings, arguing that he will personally face forced sterilization under China's "one-child policy" if he returns to Fujian Province. Such direct harm constitutes a form of persecution based on "political opinion" for which asylum may be granted. See 8 U.S.C. § 1101(a)(42)(B); *Lin v. U.S. Dep't. of Justice*, 494 F.3d 296 (2d Cir. 2007). The Board of Immigration Appeals (BIA or Board) denied Ni's motion, holding that "his evidence [was] not sufficient to establish a change in circumstances or country conditions," as generally is required when an applicant files a motion to reopen removal proceedings more than 90 days after the entry of a final administrative order.

The courts of appeals have received scores of strikingly similar petitions for review involving Fujian Province in recent years, and we have regularly upheld the BIA's refusal to grant relief in such proceedings. Routine can be numbing, however, and it can lead to errors.

---

** (...continued)

District Court for the Central District of Illinois, sitting by designation.

Here, in evaluating Ni's motion to reopen, the BIA failed meaningfully to address documents bolstering Ni's assertion that conditions in China have changed for the worse. Ni's evidence indicates that family planning officials in and around his hometown recently launched a crackdown on those who flout the "one-child policy." This oversight is particularly worrisome in light of the BIA's frequent admonitions that such locality-specific evidence of coercive enforcement measures is necessary for asylum claims predicated on China's population control policies. Because the BIA failed "to announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted," see *Iglesias v. Mukasey*, 540 F.3d 528, 531 (7th Cir. 2008), we grant Ni's petition for review.

**I**

A motion to reopen is "an 'important safeguard' intended 'to ensure a proper and lawful disposition' of immigration proceedings." *Kucana v. Holder*, 130 S. Ct. 827, 834 (2010) (quoting *Dada v. Mukasey*, 554 U.S. 1, 18 (2008)). Subject to certain exceptions, an alien may file only one such motion, and he must do so within 90 days of the date of entry of a final administrative order of removal. 8 U.S.C. § 1229a(c)(7). These time and numerical limitations present no bar, however, to a motion to reopen that is "based on changed country conditions arising in the country . . . to which removal has been ordered." § 1229a(c)(7)(C)(ii). The movant must present

"evidence [that] is material and was not available and would not have been discovered or presented at the previous proceeding" to establish such a change. *Id*.

Because the Board has broad discretion in such matters, we employ a deferential standard of review. *Kucana*, 130 S. Ct. at 834. The BIA abuses its discretion if "it has made its decision without rational explanation, departs from established policies without explanation, or rests on an impermissible basis such as invidious discrimination." *Jiang v. Holder*, 639 F.3d 751, 754 (7th Cir. 2010). Its determination must be "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Youkhana v. Gonzales*, 460 F.3d 927, 931 (7th Cir. 2006).

In assessing motions to reopen involving enforcement of China's population policies, the BIA has emphasized that it assesses each application on a "case-by-case" basis. *In re S-Y-G-*, 24 I. & N. Dec. 247, 251 (BIA 2007). An applicant may successfully reopen his asylum case by showing "that (1) a relevant change in country conditions occurred, (2) the applicant has violated family planning policy as established in that alien's local province, municipality, or other relevant area, and (3) the violation would be punished in a way that would give rise to a well-founded fear of persecution." *Id*. Should the BIA find that no relevant change has occurred, it must provide a "reasoned explanation for its finding that [a petitioner] ha[s] not provided evidence of changed conditions." *Gebreeyesus v. Gonzales*, 482 F.3d 952, 955 (7th Cir. 2007). Importantly for present

purposes, we cannot accept "an agency's inadequately justified decision 'by substituting what [we] consider[] to be a more adequate or proper basis' for the decision." *Borovsky v. Holder*, 612 F.3d 917, 921 (7th Cir. 2010) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

## II

Ni arrived at Los Angeles International Airport on August 13, 2001, and promptly sought asylum. He initially claimed that he fled Fujian Province after Chinese authorities shuttered his bookstore in response to his sale of Falun Gong materials, but an Immigration Judge (IJ) denied relief on that basis in 2003 and ordered him removed. The BIA summarily affirmed the IJ's opinion on June 8, 2004, and this court denied Ni's petition for review on June 20, 2005. *Ni*, 134 F. App'x at 980.

At that point, rather than depart, Ni remained in New York City. In 2006, he married Feng Mei Yang, also a native and citizen of China, and they now have two children. On July 5, 2011, a month after the birth of his second child, Ni moved to reopen his removal proceedings. He asserted that under China's strict family planning policy, the government permits couples to have only one child, and that he would be forced to undergo sterilization should he be removed to Fujian Province. If proven, this would make Ni eligible for asylum on "political opinion" grounds, since a person who can demonstrate a "well founded fear that he or

she will be forced to undergo such a procedure [abortion or sterilization] or [be] subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion." 8 U.S.C. § 1101(a)(42)(B).

Ni's motion to reopen came seven years after the BIA's final order of removal in 2004, well beyond the ordinary 90-day time limit. In order to obtain reopening, Ni had to make a threshold showing of "changed country conditions" in China. 8 U.S.C. § 1229a(c)(7)(C)(ii). Because the birth of Ni's two children in the United States is "merely a change in personal circumstances" rather than a change in "country conditions," *Xiao Jun Liang v. Holder*, 626 F.3d 983, 988 (7th Cir. 2010) (internal quotation marks and citations omitted), most of Ni's motion focused on establishing an increase in forced sterilizations and abortions in Fujian Province in recent years.

Ni's effort to make such a showing had to take into account the U.S. Department of State's *2007 Country Profile of Asylum Claims and Country Conditions* (*2007 Country Profile*), which states that "U.S. officials in China are not aware of [an] alleged official policy, at the national or provincial levels, mandating the sterilization of one partner of couples that have given birth to two children, at least one of whom was born abroad," and that "central government policy prohibits the use of physical coercion to compel persons to submit to abortion or sterilization." Nevertheless, portions of the *2007 Country Profile* suggest that abuses may occur at the local level. In the past, the BIA has found this report

to be "highly probative and reliable evidence of country conditions in Fujian Province" and has relied on it to deny asylum requests by similarly situated applicants. See *In re H-L-H- & Z-Y-Z-*, 25 I. & N. Dec. 209 (BIA 2010).

Ni had two responses to the *2007 Country Profile*: he challenged its methodology and findings; and he argued that its relatively sanguine assessment established only a baseline of "country conditions in China as they existed on or before May 2007." Since then, Ni contends, conditions have worsened. In support of this claim, Ni submitted nearly 900 pages of indexed documents, including a scholarly critique of the *2007 Country Profile* by Dr. Flora Sapio; the 2009 and 2010 Annual Reports of the Congressional-Executive Commission on China (CECC Reports); various research articles and media reports; and, perhaps most importantly, dozens of directives and communiqués to and from local family planning officials throughout Fujian Province. We discuss these documents in greater depth below, but in general they support the proposition that enforcement of China's family planning policy has become more stringent since 2007 in Fujian Province, and that coerced sterilization and abortions are becoming more common.

The BIA gave short shrift to Ni's presentation. After cataloging the voluminous evidence Ni submitted, it offered a one and one-half page explanation of why these materials failed to persuade it of "changed conditions" in China. Most of this discussion focused on why the Board found the *2007 Country Profile* reliable, and why it found Dr. Sapio's critique unpersuasive. The

Board did not directly address Ni's contention that con-ditions had deteriorated since the issuance of the *2007 Country Profile*, though it very briefly touched upon the 2009 and 2010 CECC Reports and the collection of government directives that Ni submitted. Neither set of materials, it concluded, was "sufficient to demonstrate that the respondent will be subjected to sterilization" or "suffer mistreatment amounting to persecution" upon return to China. Because Ni had "exceed[ed] the time limit for motions to reopen" and failed "to establish a change in circumstance or country conditions 'arising in the country of nationality' so as to create an exception to the time and number limitations for filing a late motion to reopen," the BIA denied Ni's motion to reopen.

**III**

Particularly when an alien submits nearly 1,000 pages of evidence, the BIA need not "expressly parse or refute on the record each individual argument or piece of evi-dence offered by the petitioner." *Shao v. Mukasey*, 546 F.3d 138, 169 (2d Cir. 2008); see also *Iglesias*, 540 F.3d at 531 ("[T]he BIA does not have to write an exegesis on every contention, [though] it must consider the issues raised . . . ."). But that does not mean that the Board can simply disregard relevant evidence. Here, it appears that the Board failed to notice that Ni presented precisely the sort of evidence it has demanded for a successful motion to reopen. We give examples below.

Initially, we confirm that the Board was entitled to reject Dr. Sapio's critique of the *2007 Country Profile*.

The BIA's opinion reveals that it considered Dr. Sapio's arguments, identified several weaknesses, and ultimately found that her "critique of the 2007 U.S. State Department Profile on China [was insufficient to] persuade [the Board] that the Profile is unreliable." Though State Department reports are not "Holy Writ," *Galina v. INS,* 213 F.3d 955, 959 (7th Cir. 2000), they are "entitled to deference," *Zheng v. Gonzales,* 409 F.3d 804, 811 (7th Cir. 2005). Such reports "are accorded special weight, because they are based on the collective expertise and experience of the Department of State, which has diplomatic and consular representatives throughout the world." *In re H–L–H–,* 25 I. & N. Dec. at 213 (internal quotation marks and citations omitted). We note that the BIA's rejection of Dr. Sapio's critique has been discussed in at least nineteen appellate cases from six circuits—many involving the same lawyers who represent Ni here—and not once has a court of appeals found the BIA's rejection of Dr. Sapio's report to constitute an abuse of discretion. See, *e.g.*, *Zheng v. Holder*, 701 F.3d 237, 241-42 (7th Cir. 2012); *Hang Chen v. Holder*, 675 F.3d 100, 108 (1st Cir. 2012); *Xiu Jin Yu v. Attorney Gen. of U.S.*, 429 F. App'x 158, 161 (3d Cir. 2011).

But it is one thing to accept the Board's evaluation of Dr. Sapio's contribution, and another to say that its treatment of the *2007 Country Profile* as a whole was unobjectionable. The Board did not indicate, for example, what "conclusions" and "highly probative evidence" from the *2007 Country Profile* it actually was crediting. This is a troubling omission, since the gravamen of Ni's motion to reopen is that the relevant changes in Fujian Province *postdate* the May 2007 publication of the State

Department's report. In its brief, the government urges
that the BIA "reasonably found persuasive and relied
on" the following pieces of the Profile:

- "Central government policy prohibits the use of
  physical coercion to compel persons to submit
  to sterilization or abortion."

- "U.S. diplomats in China have heard reports that
  local officials occasionally employ illegal means,
  such as forcibly performing abortions or steriliza-
  tions . . . but only . . . from Provinces other than
  Fujian."

- "Consulate General officials visiting Fujian . . . did
  not find any cases of physical force employed
  in connection with abortion or sterilization."

- "[I]n interviews with visa applicants from Fujian,
  representing a wide cross-section of society, Con-
  sulate General officers have found that many
  violators of the one-child policy paid fines but
  found no evidence of forced abortion or property
  confiscation."

Ni's motion to reopen accepted that this was the case
in 2007, explaining that "[t]he Board has repeatedly
emphasized its perception [based on the *2007 Country
Profile*] of the Chinese government's enforcement of the
population control policy on or before May 2007 as
'lax.'" For present purposes, we accept this under-
standing of the *Profile*.

The crux of Ni's argument, however, is that conditions in
Fujian Province, and specifically in and around Ni's

small hometown of Guantou Town (population 5,790, see http://www.tiptopglobe.com/city?n=Guantou&p=5790#lat= 26.15544&lon=119.60815&zoom=7, last visited April 23, 2013) have since worsened. See *Liang*, 626 F.3d at 989 ("[U]nless [petitioner] could show that China's enforcement of the policy had become more stringent in her province since her last hearing, she could not prevail."). To support his contention, Ni pointed to reports issued in 2009 and 2010 by the Congressional-Executive Commission on China. These more recent reports, he argues, offer a darker assessment of conditions in China than the *2007 Country Profile*. The reports were not buried in Ni's filings: he discusses them at length in the body of the motion to reopen, and they appear as the first two exhibits in his lengthy appendix of "Background Documents in Support of Motion to Reopen." The 2009 CECC Report (published October 10, 2009), for example, stated that "the use of coercive measures" to enforce birth control policies is now "commonplace"; that "in the past year, authorities in various localities forced women to undergo abortions, and in some cases, reportedly beat violators of population planning regulations"; and that "local authorities continue to mandate surgical sterilization and the use of contraception as a means to enforce birth quotas." In some areas of Fujian Province, the Report specified, "authorities . . . employed abortion as an official policy instrument." Fujian Province is also listed as an area where "population planning officials are authorized to take 'remedial measures' to deal with 'out-of-plan' pregnancies." According to the Report's authors, the term "remedial measures"

(*bujiu cuoshi*) is often used as a euphemism for "compulsory abortion." The 2010 CECC Report (published October 10, 2010) offers a similarly bleak assessment. Its key findings include the observation that "Chinese authorities continued [in 2010] to implement population planning policies that interfere with and control the reproductive lives of women [including] forced sterilization [and] forced abortions," and that, at least with respect to migrant workers, forced abortions were becoming more common. Early in the year, the Report also observed, "authorities across a wide range of Chinese localities launched population planning enforcement campaigns—often dubbed 'spring family planning service activities' (*chunji jisheng fuwu xingdong*)—that employed coercive measures to terminate 'out-of-plan' pregnancies." These coercive measures included forced sterilizations and abortions.

The BIA did not ignore these Reports altogether, but it brushed over them lightly with the following comment:

> The evidence indicates that social compensation fees, job loss or demotion, loss of promotion opportunity, expulsion from the party, destruction of property, and other administrative punishments are used to enforce the family planning policy. [Citing 2009 and 2010 Congressional-Executive Commission Reports.] The evidence reflects that China regards a child of Chinese nationals who have not permanently settled in another country as a Chinese national, but it is not sufficient to demonstrate that the respondent will be subjected to sterilization. [Citing *Liang*

*v. Holder*, 626 F.3d 983 (7th Cir. 2010); *In re S-Y-G-*, 24 I. & N. Dec. 247 (BIA 2007)].

The opinion contains no further mention of the CECC Reports.

This response tells us almost nothing. It indicates that the BIA *did* credit the CECC Reports, at least in part. Why the BIA found the Reports' discussion of certain "administrative punishments" and coercive tactics to be persuasive, but found the Reports' discussion of forced sterilizations and abortions in Fujian Province not to be persuasive, however, remains a mystery. Though these same Reports have featured in previous asylum cases arising out of Fujian Province, the two cases cited by the BIA (*Liang* and *S-Y-G-*) make no mention of the Congressional-Executive Commission. We have no idea what bearing the Board thought that those cases have on Ni's evidence. This underscores a final, overarching problem: the BIA appears to have misapprehended the purpose of this evidence. Ni's argument was not that the CECC Reports constitute irrefutable proof that he "will be subjected to sterilization," but rather that they evince a steady worsening of conditions serious enough to warrant reopening his case.

Six months before the BIA ruled on Ni's motion to reopen, this court noted in a non-precedential order that "[t]he Board's failure to address the [CECC] reports is troubling: CECC reports are official publications that should be afforded weight, and the Board ought to have explained how it reconciles the CECC reports with its view that China's family-planning policy is enforced

through administrative means." *Qiao Ling Lin v. Holder*, 441 F. App'x 390, 394 (7th Cir. 2011). Though we have previously indicated that these reports, taken alone, may not be sufficient to demonstrate "changed country conditions," see *id.*; see also *Ping Zheng v. Holder*, 701 F.3d 237 (7th Cir. 2012), they were far from the only evidence Ni presented. The Board's ongoing refusal to respond meaningfully to such evidence is difficult to understand.

The BIA offered a similarly perfunctory response to dozens of official government publications Ni submitted that appear to corroborate his claim of a recent crackdown by family planning officials in Fujian Province. To give but a few examples, Ni presented a June 11, 2009, document issued by the People's Government of Guantou Town that details a "Hundred-Day Battle on population and family planning," during which officials should "complete the missions of required abortion, induced labor abortion, sterilization, and collection of social maintenance fees." This grim missive provides for rewards and penalties based on progress toward family planning goals. A March 16, 2008, Guantou Town directive entitled "Notification with regard to Tightening of this year's Implementation of Birth Control Measures" instructs officials to "step up your efforts on population and family planning . . . . [W]omen with two or more children are required to perform the sterilization." A May 10, 2007, Guantou Township Committee document references another "One-Hundred Day Campaign" during which a Special Operation Command was established to "search and arrest the rule breaker. If women is [*sic*]

confirmed to be pregnant without permit, send them to the County Hospital. Implement critical remedial measure." Ni offered several more documents from Guantou Town containing similar statements.

Ni also submitted documents from authorities in Lianjiang County, in which Guantou Town is located. A December 24, 2010, announcement celebrating the "Launching [of] Countywide Massive Family Planning Clean-up Work" details a new campaign to "stop the extra births beyond the quota" through strict adherence to "four surgeries" and "double check-ups" targets. Officials are instructed to enter homes and "take every measure possible to raise the materialization rate" for "four surgeries." Officials who do not meet goals will face "great severities" and will be assessed as "not qualified for the jobs for that year and will also be disciplined in other ways." Ni also submitted numerous additional documents from neighboring Fuzhou and Changle City, as well as from other parts of Fujian Province. All of these materials bolster his assertion of a material change in country conditions.

The Board offered a similarly brief and desultory response to this evidence:

> The respondent is from Guantou Town, Fuzhou City, and he has not shown that the documents and regulations from other towns and cities are applicable to him. The evidence that there have been reports of incidents of coercion to meet birth targets in some areas of China, contrary to the national policy, is not sufficient to establish that the re-

spondent will suffer mistreatment amounting to persecution based on the birth of his children in the United States. *See Chen v. Gonzales*, 489 F.3d 861, 862 (7th Cir. 2007) (affidavits relating personal experiences or tales about sterilizations in Fujian following the birth of children in China would not establish that a person in the respondent's position faces a material risk that this would happen to her based on the birth of her children in the United States).

Beyond these two sentences, the BIA offered no substantive commentary on Ni's proffered government documents.

This too is an inadequate response. If these documents are genuine—and this remains an important "if"—they constitute strong evidence that harrowing practices are common in the part of Fujian Province (indeed, the very town) from which Ni hails. The BIA faulted Ni for "not show[ing] that the documents and regulations from other towns and cities are applicable to him" and for relying on evidence from other areas in China, but it ignored Ni's evidence that directly addressed enforcement practices in Guantou Town, Lianjiang County, and Fuzhou City.[1] (We note that the

---

[1] According to the State Department's *2007 Country Profile*, Guantou is a town in Lianjiang County, just north of Fuzhou City. Fuzhou City and Changle City are adjacent municipalities to the south and southeast, distinct from Lianjiang County. The BIA's statement that Ni is from "Guantou Town, Fuzhou City," is thus somewhat confusing, since the record indicates

(continued...)

BIA appears to have recycled the "other towns and cities" language from previous "one-child policy" cases involving petitioners who, unlike Ni, failed to present evidence from their hometowns. See, *e.g.*, *Hang Chen*, 675 F.3d at 105 ("The BIA also stated that Chen had not shown that other towns or cities' regulations regarding family planning would apply to him.")). Assuming that the Board actually examined Ni's documents, we are left with nothing to indicate how the information contained within them affected its analysis. Nor, again, does the cited authority offer any insight: the petitioner in *Chen* presented no government documents in support of her motion to reopen. Even so, this court remanded because we worried that a newly discovered pamphlet from Changle City undermined the BIA's conclusion "that Fujian no longer uses force in its family-planning program." 489 F.3d at 863.

The government offers three theories for why the BIA might reasonably have discounted Ni's documents from China: (1) the documents were not properly authenticated pursuant to 8 C.F.R. § 1287.6;

---

[1] (...continued)
that Guantou Town is not part of Fuzhou City proper. The BIA's formulation suggests, however, that its later allusion to evidence from "other towns and cities" means "towns and cities outside the greater Fuzhou region." If so, this compounds the BIA's error, since the vast majority of documents Ni presented were, in fact, from government bodies in the general area (*i.e.*, Fuzhou City, Changle City, and Lianjiang County).

(2) Ni had a prior adverse credibility finding during his earlier, unsuccessful asylum proceedings; and (3) the State Department's *2007 Country Profile* identified widespread fabrication and fraud in documents from Fujian Province. We address them in turn.

It does not appear that lack of authentication was the reason why the BIA discounted Ni's documents from Guantou Town, Lianjiang County, and Fuzhou City; rather, it seems that it simply overlooked them. It is true that early in its opinion, the BIA noted that Ni's "documents from China have not been authenticated pursuant to 8 C.F.R. § 1287.6," but in the same sentence, the BIA also explained that Ni "offer[ed] evidence that his attorney sought to have some of them authenticated." The Board said nothing about how this lack of authentication (or Ni's efforts to comply with Section 1287.6) factored into its weighing of the documents' evidentiary value, if at all, nor did it offer any other assessment of the documents' authenticity. In other cases from China, courts have noted that the BIA does not treat failure to authenticate under Section 1287.6 as "an automatic rule of exclusion." *Liu v. Ashcroft*, 372 F.3d 529, 533 (3d Cir. 2004); see also *Shtaro v. Gonzales*, 435 F.3d 711, 717 (7th Cir. 2006) (failure to authenticate evidence "does not amount to presumptive proof of falsity"). This is a sensible approach, since "it may not be possible for an applicant filing a motion to reopen to obtain from a foreign government valid and proper authentication of a document [that] purports to threaten persecution." *Qin Wen Zheng v. Gonzales*, 500 F.3d 143, 149 (2d Cir. 2007).

Moreover, the BIA apparently accepted that Ni's documents from "other towns and cities" did constitute evidence of "coercion to meet birth targets in some [other] areas of China." The government can point to nothing in the record that explains why the BIA would credit these (similarly unauthenticated) government documents, but not the more directly relevant evidence from Guantou Town and Lianjiang County. At best, it is unclear how or if the BIA weighed Ni's government documents—evidence that goes to the heart of his asylum claim—and "[w]e cannot affirm the BIA if the basis for its decision is unclear." *Kadia v. Holder*, 557 F.3d 464, 468 (7th Cir. 2009) (citing *Chenery Corp.,* 332 U.S. at 196 ("If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable.")).

The government's other *post hoc* rationales fall short for similar reasons. At no point did the BIA suggest that it doubted the provenance of Ni's documents, either because it was giving weight to its earlier adverse opinion of Ni's credibility or because it credited the State Department's warnings about "widespread fabrication and fraud in documents from Fujian Province." The government's first theory—that the Board's adverse determination of Ni's credibility during his religious persecution asylum claim "carries over" to a later asylum claim based on distinct facts—has been expressly rejected by this court and others. *Gebreeyesus*, 482 F.3d at 955; see also *Guo v. Ashcroft*, 386 F.3d 556, 562 (3d Cir. 2004) ("No one has explained how the IJ's adverse credibility findings implicated Guo's motion to

reopen on a ground not previously dealt with by the IJ. Guo's credibility (or lack thereof) for religious persecution simply is not relevant to her motion to reopen in this case, which relied principally on the fact of her second pregnancy in contravention of China's one-child policy."). And the BIA's opinion makes no mention of the State Department's apparent concern over "widespread fabrication and fraud" in documents that purport to be from Fujian Province. Finally, it is not this court's job to conduct an independent assessment of the authenticity of Chinese official documents. We decline the government's invitation to deny the petition on the theory that Ni's documents may not be genuine, where the BIA has made no such determination on its own.

In short, the BIA's opinion does not demonstrate that it reviewed and considered all of Ni's evidence. We cannot mend "an agency's inadequately justified decision 'by substituting what [we] consider[] to be a more adequate or proper basis' for the decision." *Borovsky*, 612 F.3d at 921 (quoting *Chenery Corp.*, 332 U.S. at 196). Accordingly, we conclude that further proceedings are necessary before Ni's petition for review can properly be assessed.

**IV**

The government also urges that the BIA correctly rejected Ni's motion because he failed to make a *prima facie* showing of eligibility for asylum or withholding of removal. It notes that "when the Board's decision is supported by a rational explanation, [courts] have

found no abuse of discretion when [the BIA] has looked at a movant's *prima facie* case for asylum in evaluating her motion to reopen." *Moosa v. Holder*, 644 F.3d 380, 385 (7th Cir. 2011). Ni counters that the BIA applied a standard that was too strict, insofar as it demanded that Ni conclusively prove that he would be sterilized, rather than show a "reasonable likelihood" that he could later demonstrate an objectively reasonable fear of such persecution. See *Liang*, 626 F.3d at 989.

In this instance, neither side is right, for the simple reason that there is nothing in the Board's opinion that looks like the ruling the government postulates. The Board did state at several points that individual pieces of evidence were "not sufficient to establish that Ni would face persecution." But it never commented on the relevant standard for *prima facie* eligibility for asylum, nor did it announce that Ni had failed to make such a showing. The BIA's decision rests only on Ni's failure to meet "the requirements of section 240(c)(7)(C)(ii) of the Act because his evidence is not sufficient to establish a change in circumstances or country conditions," nothing more. We add that we cannot deny the petition for review based on the assumption that the Board's silence about Ni's *prima facie* case must mean something favorable to the government.

In closing, we note that we make no prediction on the ultimate outcome of Ni's motion to reopen or his application for asylum. But he is entitled to have the expert agency, the BIA, evaluate in a transparent way the evidence that he has presented. Simply stating that

a 2007 document defeats a claim, when the alien has accepted 2007 as a baseline and has introduced voluminous evidence of change in later years, will not do. The BIA "must consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Iglesias*, 540 F.3d at 531. That has not yet happened here.

For these reasons, the petition for review is GRANTED, and Ni's case is REMANDED to the BIA for further proceedings consistent with this opinion.